## BAZEMORE ET AL. *v.* FRIDAY ET AL.

No. 85–93.   Argued April 22, 1986—Decided July 1, 1986*

*Together with No. 85–428, *United States et al.* v. *Friday et al.*, also on certiorari to the same court.

*Deputy Solicitor General Kuhl* argued the cause for petitioners in No. 85–428. With her on the briefs were *Solicitor General Fried, Assistant Attorney General Reynolds, Deputy Assistant Attorney General Carvin, Walter W. Barnett, Louise A. Lerner,* and *David B. Marblestone. Eric Schnapper* argued the cause for petitioners in No. 85–93. With him on the briefs were *Edward D. Reibman, Julius LeVonne Chambers,* and *Ronald L. Ellis.*

*Howard E. Manning, Jr.,* argued the cause for repondents in both cases. With him on the brief were *Howard E. Manning* and *Millard R. Rich,* Deputy Attorney General of North Carolina.†

PER CURIAM.

These cases present several issues arising out of petitioners' action against respondents for alleged racial discrimination in employment and provision of services by the North Carolina Agricultural Extension Service (Extension Service). The District Court declined to certify various proposed classes and, after a lengthy trial, entered judgment for respondents in all respects, finding that petitioners had not carried their burden of demonstrating that respondents had engaged in a pattern or practice of racial discrimination. The District Court also ruled against each of the individual plaintiffs' discrimination claims. The Court of Appeals affirmed. 751 F. 2d 662 (CA4 1984). We hold, for the reasons stated in the concurring opinion of JUSTICE BRENNAN, that the Court of Appeals erred in holding that under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.,* the Extension Service had no duty to eradi-

---

†Briefs of *amici curiae* urging reversal were filed for the American Federation of Labor and Congress of Industrial Organizations et al. by *Michael H. Gottesman, Robert M. Weinberg, David M. Silberman,* and *Laurence Gold;* and for the National Committee on Pay Equity et al. by *Edith Barnett* and *Eileen Stein.*

*Robert E. Williams, Douglas S. McDowell, Thomas R. Bagby,* and *Garen E. Dodge* filed a brief for the Equal Employment Advisory Council as *amicus curiae* urging affirmance.

cate salary disparities between white and black workers that had their origin prior to the date Title VII was made applicable to public employers;[1] that the Court of Appeals erred in disregarding petitioners' statistical analysis because it reflected pre-Title VII salary disparities, and in holding that petitioners' regressions were unacceptable as evidence of discrimination; that the Court of Appeals erred in ignoring evidence presented by petitioners in addition to their multiple regression analyses; that, on remand, the Court of Appeals should examine all of the evidence in the record relating to salary disparities under the clearly-erroneous standard; that the reasons given by the Court of Appeals for refusing to certify a class of black employees of the Extension Service do not support a decision not to certify such a class; and that the Court of Appeals was correct in refusing to certify a class of defendant counties.[2] We further hold, for the reasons stated in the opinion of JUSTICE WHITE, that neither the Constitution nor the applicable Department of Agriculture regulations require more than what the District Court and

---

[1] The private petitioners contend that the salary disparities that occurred even prior to the date Title VII was made applicable to public employers, March 24, 1972, violate their rights under the Fourteenth Amendment, and that we should reach this issue because doing so would enable them to recover for such constitutional violations as occurred prior to that date. The Court of Appeals did not address petitioners' constitutional claim. Although there are statements in the Court of Appeals' opinion to the effect that salary disparities have lingered up to the present, the District Court made no finding as to precisely when, if ever, any disparities were eliminated. It noted simply that the "unification and integration of the Extension Service did not result immediately in the elimination of some disparities which had existed between the salaries of white personnel and black personnel . . . ." App. to Pet. for Cert. in No. 85–93, p. 31a. See also id., at 122a–123a; 201a. If, on remand, it is finally determined that pre-1965 salary disparities did continue past the date of the merger to a time for which recovery is not barred by the applicable statute of limitations, the courts below will have to decide private petitioners' constitutional claim.

[2] The issue of the certification of a class of 4–H and Extension Homemaker Club members is now moot in light of the Court's resolution of the underlying claim.

the Court of Appeals found the Extension Service has done in this case to disestablish segregation in its 4–H and Extension Homemaker Clubs. Accordingly, the judgment of the Court of Appeals is affirmed in part and vacated in part, and the cases are remanded for further proceedings consistent with this opinion.[3]

*It is so ordered.*

JUSTICE BRENNAN, joined by all other Members of the Court, concurring in part.

I

A

The purpose of North Carolina's agricultural extension program, administered through the North Carolina Agricultural Extension Service (Extension Service), is to aid in the dissemination of "useful and practical information on sub-

---

[3] The private petitioners also invite this Court to consider whether an employer may immunize itself from liability for employment discrimination by delegating its employment decisions to a third party that acts in a discriminatory manner. We agree with the United States, however, that that question is not properly presented on this record. Although the Court of Appeals stated that the Extension Service is not "separately responsible" for the selection of county chairmen, 751 F. 2d, at 677, it did note that "the agreement of the Extension Service and the County Commissioners is required in order to fill the vacancy [for County Chairman]." *Id.*, at 675. Similarly, the District Court expressly found that "in the memorandum of understanding between the Extension Service and the boards of county commissioners all appointments are worked out jointly between the Extension Service and the commissioners and no official action can be taken unilaterally by either party with respect to filling a vacancy." App. to Pet. for Cert. in No. 85–93, p. 77a. This finding is supported by the record, App. 163.

Respondents do not contend that the Extension Service would not be liable for any pattern or practice of discrimination with respect to the hiring of County Extension Chairmen. Thus it was error for the Court of Appeals to consider solely the recommendations made by the Extension Service rather than the final hiring decisions in which the Extension Service and county acted together.

jects relating to agriculture and home economics." App. to
Pet. for Cert. in No. 85–93, p. 7a (hereinafter Pet. App.).
The Extension Service is a division of the School of Agricul-
ture and Life Sciences at North Carolina State University
(NCSU). It is headed by a Director who exercises authority
over District Extension Chairmen responsible for adminis-
tering all Extension Service programs within the State's six
Extension Service districts. The District Extension Chair-
men, in turn, supervise the 100 County Extension Chairmen
who are responsible for developing and coordinating all Ex-
tension Service activities within their respective counties.
The County Extension Chairmen also report to their respec-
tive Board of County Commissioners (Board), a unit of local
government, on extension programs and on matters relating
to budgeting and personnel.

The Extension Service operates in four major areas: home
economics, agriculture, 4–H and youth, and community re-
source development. In both the home economics and 4–H
areas, one of the Extension Service's methods entails the
establishment of clubs to educate the club members in home
economics and other useful and practical skills. The agricul-
tural program educates and encourages farmers to adopt sci-
entific methods and to adjust to changing economic circum-
stances. The community resource development program
emphasizes group action through citizen groups and organiza-
tions. Each of these programs is implemented by local
agents who are selected for employment jointly by the Ex-
tension Service and the county Boards. Agents are divided
into three ranks: full agent, associate agent, and assistant
agent. "While the three ranks of agents perform essentially
the same types of tasks, when an agent is promoted his
responsibilities increase and a higher level of performance is
expected of him." *Id.*, at 17a.

The salaries of all workers are determined jointly by the
Extension Service and the Boards. *Id.*, at 33a; CA App.

223; DX 78, CA App. 1684.[1] The federal, state, and county governments all contribute to these salaries. The Boards and the Extension Service determine jointly the proportionate share of salaries to be paid by the State and by the county. Moreover, all county extension hirings and firings are decided "'jointly between the North Carolina Agricultural Extension Service and the Board of County Commissioners.'" Pet. App. 24a (quoting Memorandum of Understanding, DX 78).

The Extension Service has overall responsibility for establishing qualifications for employment in the Service and for screening applicants before recommending qualified applicants to the county commissioners for appointment to vacant or new positions. The Extension Service also prepares and submits an annual budget request to the Board for the county's share of funds for salaries.

Each Board reviews the budget requests from the Extension Service each year and confers with and advises the District and County Extension Chairman concerning Extension Service programs. The Board furnishes the county's share of salaries for extension personnel. In addition, it provides office space and equipment, utilities, telephone, demonstration materials, etc.

Prior to August 1, 1965, the Extension Service was divided into two branches: a white branch and a "Negro branch." Only the "Negro branch" had a formal racial designation. The "Negro branch" was composed entirely of black personnel and served only black farmers, homemakers, and youth. The white branch employed no blacks, but did on occasion serve blacks. On August 1, 1965, in response to the Civil Rights Act of 1964, the State merged the two branches of the

[1] In this opinion, and in my opinion dissenting in part, *post*, p. 309, the following designations are used to refer to the record. GX, exhibit of Federal Government; DX, defendant's exhibit; Tr., trial transcript; CA App., Appendix in the Court of Appeals.

Extension Service into a single organization. However, as the District Court subsequently found, "[the] unification and integration of the Extension Service did not result immediately in the elimination of some disparities which had existed between the salaries of white personnel and black personnel . . . ." *Id.*, at 31a.

B

The private petitioners include employees of the Extension Service, recipients of its services, members of Extension Homemaker Clubs, and parents of 4–H Club youths. Complaint 12. They brought this action in 1971 alleging racial discrimination in employment and in the provision of services on the part of the Extension Service in violation of the First, Fifth, and Fourteenth Amendments to the Constitution, 42 U. S. C. §§ 1981, 1983 and 2000d, and 7 U. S. C. § 341 *et seq.* The defendants, respondents here, were William C. Friday, President of NCSU, and various officials associated with the University and its School of Agriculture. In addition, County Commissioners from Alamance, Edgecomb, and Mecklenburg Counties were also named as defendants.

On April 7, 1972, the United States intervened under § 902 of Title IX and §§ 601 and 602 of Title VI of the Civil Rights Act of 1964, 42 U. S. C. §§ 2000h–2, 2000d, and 2000d–1. The United States subsequently amended its complaint in intervention to include allegations that defendants had also violated §§ 703 and 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U. S. C. §§ 2000e–2 and 2000e–5. The United States' complaint essentially tracked the claims made by the private petitioners. The private petitioners were permitted on the eve of trial to amend their complaint to add a claim under Title VII as well.

On two occasions prior to trial the District Court was asked, but declined, to certify the action as a class action.

Near the close of trial the plaintiffs again requested the court to certify four classes of plaintiffs and one class of defendants.[2] However, the District Court once again declined to do so, and this decision was subsequently upheld by the Court of Appeals. On the merits, the trial court explored allegations of racial discrimination in virtually every aspect of the Extension Service's employment practices and provision of services.[3] The District Court ruled in favor of respondents in all respects. On most issues it concluded that peti-

---

[2] The classes considered by the District Court in its August 20, 1982, memorandum were:

"(1) All Black and Indian employees and potential employees of the [Extension Service] since November 18, 1971, and thereafter;

"(2) All Black and Indian persons who were recipients or potential recipients of service from the [Extension Service] on November 18, 1971, and thereafter;

"(3) All Black and Indian members or potential members of the [Extension Service's] 4–H Clubs on November 18, 1971, and thereafter;

"(4) All Black and Indian persons who were members or potential members of the [Extension Service's] Homemaker Clubs on November 18, 1971, and thereafter, and

"(5) [A defendant class consisting of a]ll County Commissioners in North Carolina, in their official capacities, on November 18, 1971, and thereafter." Pet. App. 37a.

The claims relating to American Indians were dismissed by the District Court because petitioners at trial presented no evidence to support these claims. *Id.*, at 49a, n. 11. No issue with respect to these claims is before us.

[3] Petitioners sought to prove that respondents had continued to assign black employees only to counties that had black employees prior to 1965; had failed to recruit, hire, and assign blacks on an equal basis with whites; had denied blacks the same compensation, terms, conditions, and privileges as were provided to whites; had segregated blacks in work assignments; had failed to establish selection standards sufficiently objective to prevent discrimination in hiring and promotion; had failed to correct the present effects of past discrimination; had failed to provide minorities with services equal to the services provided white persons; and had failed to maintain nonracially segregated 4–H Clubs and Extension Homemaker Clubs. *Id.*, at 50a–51a.

tioners had failed to carry their burden of proof. As a general proposition, the District Court was of the view that the Extension Service had conducted itself in a nondiscriminatory manner since it became subject to Title VII and since the merger of the black and white branches in 1965. Both the private petitioners and the United States limited their appeals to the claims that the District Court erred in considering the evidence before it regarding salaries and promotions to County Chairmen, and in concluding that the Extension Service had not discriminated against blacks with respect to salaries and promotions to County Chairmen. The United States also claimed that the system used to determine merit pay increases violated Title VII. The private petitioners also appealed the rejection of their claim that respondents were unlawfully providing services and materials to segregated 4–H and Extension Homemaker Clubs, and the District Court's refusal to certify the case as a class action. The Court of Appeals affirmed the District Court in all respects. 751 F. 2d 662 (CA4 1984). We granted certiorari, 474 U. S. 978 (1985).[4]

---

[4] The question presented in the Federal Government's petition is whether black state employees establish a claim under § 703(a) of the 1964 Civil Rights Act, 42 U. S. C. 2000e–2(a), by identifying current salary disparities between themselves and white employees holding the same jobs, when such disparities result from a state policy before 1965 of paying blacks lower salaries than whites.

The private petitioners presented the same question as that presented by the Federal Government, and four additional questions:

(1) May a regression analysis be treated as probative evidence of discrimination where the analysis does not incorporate every conceivable relevant variable?

(2) May North Carolina satisfy its obligation to desegregate the *de jure* system of 4–H Clubs and Extension Homemaker Clubs by adopting a freedom of choice plan that fails?

(3) May an employer immunize itself from liability for illegal discrimination by delegating its hiring decisions to a third party?

(4) Did the Fourth Circuit err in denying class certification in this case?

## II

The first issue we must decide is whether the Court of Appeals erred in upholding the District Court's finding that petitioners had not proved by a preponderance of the evidence that respondents had discriminated against black Extension Service employees in violation of Title VII by paying them less than whites employed in the same positions. The Court of Appeals reasoned that the Extension Service was under no obligation to eliminate any salary disparity between blacks and whites that had its origin prior to 1972 when Title VII became applicable to public employers such as the Extension Service.[5] It also reasoned that factors, other than those included in petitioners' multiple regression analyses, affected salary, and that therefore those regression analyses were incapable of sustaining a finding in favor of petitioners.

## A

Both the Court of Appeals and the District Court found that before the black and white Extension Service branches were merged in 1965, the Extension Service maintained two separate, racially segregated branches and paid black employees less than white employees. Pet. App. 120a; 751 F. 2d, at 666. The Court of Appeals also acknowledged that after the merger of the Extension Service, "[s]ome pre-existing salary disparities continued to linger on," and that these disparities continued after Title VII became applicable to the Extension Service in March 1972 and after this suit was filed. *Ibid.* Indeed, the Court of Appeals noted that "the Extension Service admits that, while it had made some adjustments to try to get rid of the salary disparity resulting

---

[5] As originally enacted, Title VII of the Civil Rights Act of 1964 applied only to private employers. The Act was expanded to include public employees by the Equal Employment Opportunity Act of 1972, 86 Stat. 103, whose effective date was March 24, 1972. See 42 U. S. C. §§ 2000e(a), (b), (f), (h).

on account of pre-Act discrimination, it has not made all the adjustments necessary to get rid of all such disparity." *Id.*, at 672. See also Brief for Respondents 32 ("[E]fforts were made to reduce the average differences but due to the county by county salary differences and finding *[sic]* structure 1971 *[sic]*, the averages were not eliminated"). The court interpreted petitioners' claim on appeal to be that "the pre-Act discriminatory difference in salaries should have been affirmatively eliminated but has not." 751 F. 2d, at 670. Relying on our cases in *Hazelwood School District* v. *United States*, 433 U. S. 299 (1977), and *United Air Lines, Inc.* v. *Evans*, 431 U. S. 553 (1977), it concluded, "[w]e do not think this is the law." 751 F. 2d, at 670.

The error of the Court of Appeals with respect to salary disparities created prior to 1972 and perpetuated thereafter is too obvious to warrant extended discussion: that the Extension Service discriminated with respect to salaries *prior* to the time it was covered by Title VII does not excuse perpetuating that discrimination *after* the Extension Service became covered by Title VII. To hold otherwise would have the effect of exempting from liability those employers who were historically the greatest offenders of the rights of blacks. A pattern or practice that would have constituted a violation of Title VII, but for the fact that the statute had not yet become effective, became a violation upon Title VII's effective date, and to the extent an employer continued to engage in that act or practice, it is liable under that statute. While recovery may not be permitted for pre-1972 acts of discrimination, to the extent that this discrimination was perpetuated after 1972, liability may be imposed.

Each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior

to the effective date of Title VII. The Court of Appeals plainly erred in holding that the pre-Act discriminatory difference in salaries did not have to be eliminated.[6]

---

[6] Neither *Hazelwood* nor *Evans* suggests any different rule, and indeed those cases support the result here. In *Evans*, respondent, a female flight attendant, was forced to resign in 1968 from her position due to her employer's policy forbidding female flight attendants to marry. Respondent there never brought an action with respect to this forced resignation. In 1972 she was rehired by the airline as a new hire, and given seniority only from that date. Although her claim with respect to the 1968 resignation was time barred, respondent filed suit claiming that the airline was guilty of a present, continuing violation of Title VII because the seniority system treated her less favorably than males who were hired after her termination in 1968 and prior to her reemployment. Further, she claimed that the seniority system gave present effect to the past, illegal forced retirement and thereby perpetuated the consequences of forbidden discrimination. Respondent had made no allegation that the seniority system itself was intentionally designed to discriminate. Because a lawsuit on the forced resignation was time barred, however, it was to be treated as an act occurring before the statute was passed, and therefore it had "no present legal consequences," 431 U. S., at 558, even though "[i]t may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." *Ibid.* The "critical question," the Court declared, "is whether any *present violation* exists." *Ibid.* (emphasis added). Because the employer was not engaged in discriminatory practices at the time the respondent in *Evans* brought suit, there simply was no violation of Title VII.

In *Hazelwood*, the Attorney General brought suit against the Hazelwood School District and various of its officials claiming that they were engaged in a pattern or practice of discriminatory hiring in violation of Title VII. We vacated the decision of the Court of Appeals that directed judgment for the Government, because that decision did not take into account the possibility that the prima facie statistical proof in the record "might at the trial court level be rebutted by statistics dealing with Hazelwood's hiring after it became subject to Title VII." 433 U. S., at 309. We explained that "[a] public employer who from [1972] forward made all its employment decisions in a wholly nondiscriminatory way would not violate Title VII even if it had formerly maintained an all-white work force by purposefully excluding Negroes." *Ibid.*

Here, however, petitioners are alleging that in continuing to pay blacks less than similarly situated whites, respondents have *not* from the date of

The Court of Appeals' conclusion that pre-Act salary discrimination did not have to be eliminated undermines the rest of its analysis of the District Court opinion. Having rejected the effect of pre-Act discrimination, the court considered solely whether the Extension Service discriminated with respect to the application of quartile rankings which, according to the Court of Appeals, were "the only aspect of salary computation in which the Extension Service exercised any discretion." 751 F. 2d, at 674.[7] Because, as we have explained, the Extension Service was under an obligation to eradicate salary disparities based on race that began prior to the effective date of Title VII,[8] the Court of Appeals erred in concentrating its analysis solely on the issue whether there was racial discrimination in the ranking system.

B

We now turn to the issue whether the Court of Appeals erred in upholding the District Court's refusal to accept the petitioners' expert statistical evidence as proof of discrimina-

the Act forward "made all [their] employment decisions in a wholly nondiscriminatory way." *Ibid.* Our holding in no sense gives legal effect to the pre-1972 actions, but, consistent with *Evans* and *Hazelwood,* focuses on the present salary structure, which is illegal if it is a mere continuation of the pre-1965 discriminatory pay structure.

[7] Quartile ranking refers to the practice of the Extension Service of placing each agent in the first, second, third, or fourth quartile, according to his or her performance for the previous period. These rankings influence salary decisions.

[8] This lawsuit involves two distinct types of salary claims: those of employees subject to the premerger discriminatory pay structure and those hired after the merger of the black and white branches. If the acknowledged pre-1965 disparities continued for employees employed prior to 1965, then respondents violated the law. But for employees covered by this suit who were never employed under the dual system, it is meaningless to say that the pre-1965 disparity "continued" past 1972, absent (1) evidence that new disparities were created or begun *after* the merger that continued past 1972, or (2) evidence that new disparities were created after 1972. See Brief for Plaintiffs-Appellants Bazemore et al. in Nos. 82–1873(L), 82–1881, 82–1927, 82–2065 (CA4), pp. 24–41.

tion by a preponderance of the evidence. In a case alleging that a defendant has engaged in a pattern and practice of discrimination under § 707(a) of the Civil Rights Act of 1964, 42 U. S. C. § 2000e–6(a), plaintiffs must "establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Teamsters* v. *United States*, 431 U. S. 324, 336 (1977). Further, our decision in *United States Postal Service Board of Governors* v. *Aikens*, 460 U. S. 711 (1983), although not decided in the context of a pattern-and-practice case, makes clear that if the defendants have not succeeded in having a case dismissed on the ground that plaintiffs have failed to establish a prima facie case, and have responded to the plaintiffs' proof by offering evidence of their own, the factfinder then must decide whether the plaintiffs have demonstrated a pattern or practice of discrimination by a preponderance of the evidence. This is because the only issue to be decided at that point is whether the plaintiffs have actually proved discrimination. *Id.*, at 715. This determination is subject to the clearly-erroneous standard on appellate review. See *Anderson* v. *Bessemer City*, 470 U. S. 564 (1985); *Pullman-Standard* v. *Swint*, 456 U. S. 273 (1982).

At trial, petitioners relied heavily on multiple regression analyses designed to demonstrate that blacks were paid less than similarly situated whites. The United States' expert prepared multiple regression analyses relating to salaries for the years 1974, 1975, and 1981. Certain of these regressions used four independent variables—race, education, tenure, and job title. Petitioners selected these variables based on discovery testimony by an Extension Service official that four factors were determinative of salary: education, tenure, job title, and job performance. GX 159, pp. 90, 96. In addition, regressions done by the Extension Service itself for 1971 included the variables race, sex, education, and experience; and another in 1974 used the variables race, education,

and tenure to check for disparities between the salaries of blacks and whites. GX 214; Tr. 3915–3918; CA App. 1681; Tr. 3920.

The regressions purported to demonstrate that in 1974 the average black employee earned $331 less per year than a white employee with the same job title, education, and tenure, GX 123; CA App. 1601; Tr. 364–365, and that in 1975 the disparity was $395, GX 123; CA App. 1589; Tr. 377.[9] The regression for 1981 showed a smaller disparity which lacked statistical significance.

The Court of Appeals stated:

> "[The] district court refused to accept plaintiffs' expert testimony as proof of discrimination by a preponderance of the evidence because the plaintiffs' expert had not included a number of variable factors the court considered relevant, among them being the across the board and percentage pay increases which varied from county to county. The district court was, of course, correct in this analysis." 751 F. 2d, at 672.

The Court of Appeals thought the District Court correct for essentially two reasons: First, the Court of Appeals rejected petitioners' regression analysis because it "contained salary figures which reflect the effect of pre-Act discrimination, a consideration not actionable under Title VII . . . ." *Ibid.* (footnote omitted). Second, the court believed that "[a]n appropriate regression analysis of salary should . . . include *all* measurable variables thought to have an effect on salary level." *Ibid.* In particular, the court found that the failure to consider county-to-county differences in salary increases was significant. It concluded, noting: "[B]oth experts omitted from their respective analysis variables which ought to be reasonably viewed as determinants of salary. As a result, the regression analysis presented here must be

---

[9] Petitioners' expert testified that both of these disparities were statistically significant. Tr. 364–365, 377.

considered unacceptable as evidence of discrimination."
*Ibid.* The Court of Appeals' treatment of the statistical evidence in this case was erroneous in important respects.

1

The Court of Appeals erred in stating that petitioners' regression analyses were "unacceptable as evidence of discrimination," because they did not include "all measurable variables thought to have an effect on salary level." The court's view of the evidentiary value of the regression analyses was plainly incorrect. While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors "must be considered unacceptable as evidence of discrimination." *Ibid.* Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.[10]

Importantly, it is clear that a regression analysis that includes less than "all measurable variables" may serve to prove a plaintiff's case. A plaintiff in a Title VII suit need not prove discrimination with scientific certainty; rather, his or her burden is to prove discrimination by a preponderance of the evidence. *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248, 252 (1981). Whether, in fact, such a regression analysis does carry the plaintiffs' ultimate burden will depend in a given case on the factual context of each case in light of all the evidence presented by both the plaintiff and the defendant. However, as long as the court may fairly conclude, in light of all the evidence, that it is more likely

---

[10] There may, of course, be some regressions so incomplete as to be inadmissible as irrelevant; but such was clearly not the case here.

than not that impermissible discrimination exists, the plaintiff is entitled to prevail.

2

In this case the Court of Appeals failed utterly to examine the regression analyses in light of all the evidence in the record. Looked at in its entirety, petitioners offered an impressive array of evidence to support their contention that the Extension Service engaged in a pattern or practice of discrimination with respect to salaries. In addition to their own regression analyses described above, petitioners offered regressions done by the Extension Service for 1971 and 1974 that showed results similar to those revealed by petitioners' regressions. Tr. 3917; CA App. 1681. Petitioners also claim support from multiple regressions presented by respondents at trial for the year 1975. Using the same model that petitioners had used, and similar variables, respondents' expert obtained substantially the same result for 1975, a statistically significant racial effect of $384. CA App. 1716. Indeed, respondents also included in their analysis, "quartile rank" as an independent variable, and this *increased* the racial effect to $475.[11]

Petitioners also presented evidence of pre-Act salary discrimination, and of respondents' ineffectual attempts to eradicate it. For example, petitioners submitted evidence, and the District Court found, that blacks were paid less than whites in comparable positions prior to the merger of the black and white services in 1965. Pet. App. 120a. Moreover, in 1971, respondents acknowledged that substantial sal-

[11] With respect to the increased disparity when quartile rank was added to the regression analysis, respondents' expert stated that 20% of the data was missing when quartile rankings were added, and he was unable to explain the effect of the increase in the disparity when those rankings were added. Tr. 6242.

ary differences between blacks and whites existed.[12] In addition, evidence was offered to show that the efforts by the Extension Service to equalize those salaries in 1971 were insufficient to accomplish the goal. Tr. 242–246; GX 98. As we made clear in *Hazelwood School District* v. *United States*, 433 U. S., at 309–310, n. 15 "[p]roof that an employer engaged in racial discrimination prior to the effective date of Title VII might in some circumstances support the inference that such discrimination continued, particularly where relevant aspects of the decisionmaking process had undergone little change."[13]

Further, petitioners presented evidence to rebut respondents' contention that county-to-county variations in contributions to salary explain the established disparity between black and white salaries. The United States presented evidence, which it claims respondents did not rebut, establishing that black employees were not located disproportionately in the counties that contributed only a small amount to Extension Service salaries. GX 216; see also CA App. 189. Absent a disproportionate concentration of blacks in such counties, it is difficult, if not impossible, to understand how the fact that some counties contribute less to salaries than others could explain disparities between black and white salaries.

---

[12] Dr. T. Carlton Blalock, then Assistant Director for Administration in the Extension Service, pointed out that black county professionals were earning an average of $800 to $1,100 per year less than whites in 1970. Tr. 3905, 3911. The Blalock memorandum stated:

"Believe you'd agree our salaries for women & non-white men on average are lower—Our figures verify—Due to several factors-

-The competitive market—This is not acceptable as a reason though.

-Tradition—not just in Ext.

-Less county support for non-white positions." GX 157, App. 129.

[13] On appeal petitioners specifically complained that the District Court had not given any weight to the pre-Act discrimination in its analysis. However, to the extent that proof is required to establish discrimination with respect to salary disparities created after 1972, see *supra*, at 394–397, evidence of pre-Act discrimination is quite probative.

In addition, the United States presented an exhibit based on 1973 data for 23 counties showing 29 black employees who were earning less than whites in the same county who had comparable or lower positions and tenure. GX 102.

Finally, and there was some overlap here with evidence used to discredit the county-to-county variation theory, petitioners presented evidence consisting of individual comparisons between salaries of blacks and whites similarly situated. GX 102, DX 48. Witness testimony, claimed by petitioners to be unrebutted, also confirmed the continued existence of such disparities. CA App. 190; Tr. 2010–2012, 2685, 2825–2826.

Setting out the range of persuasive evidence offered by petitioners demonstrates the error of the Court of Appeals in focusing solely on the characteristics of the regression analysis. Although we think that consideration of the evidence makes a strong case for finding the District Court's conclusion clearly erroneous,[14] we leave that task to the Court of

---

[14] There was very little evidence to show that there was in fact no disparity in salaries between blacks and whites, or to demonstrate that any disparities that existed were the product of chance. The District Court did point to cases of individual differences that it found to be successfully rebutted by respondents. In addition, the District Court alluded to evidence presented by defendants relating to salaries for 1976 and thereafter, Pet. App. 146a–147a, CA App. 2227–2231, but, putting aside whether that evidence actually contradicted petitioners', it is simply not very probative of whether there existed a pattern or practice of discrimination prior to 1976. The District Court also pointed to "scattergrams" or graphs based on the data in respondents' regressions, concluding that these graphs displayed the salaries of blacks and whites "in a completely random distribution." Pet. App. 148a. Yet, as pointed out by the United States in its brief below, the very purpose of a regression analysis is to organize and explain data that may appear to be random. See Fisher, Multiple Regression in Legal Proceedings, 80 Colum. L. Rev. 702, 705–707 (1980). Thus, it is simply wrong to give weight to a scattergram while ignoring the underlying regression analysis. Respondents' strategy at trial was to declare simply that many factors go into making up an individual employee's salary; they made no attempt that we are aware of—statistical or otherwise—to demonstrate that when these factors were properly organized and

Appeals on remand which must make such a determination based on the "entire evidence" in the record. *United States* v. *United States Gypsum Co.*, 333 U. S. 364 (1948).[15]

## III

The private petitioners complain that the District Court and Court of Appeals erred in failing to certify this case as a class action. They seek the certification of three distinct classes: (1) all black employees of the Extension Service on or after November 18, 1971; (2) all current black members and potential black members of the 4–H and Extension Home-

---

accounted for there was no significant disparity between the salaries of blacks and whites.

[15] We do note, however, that certain conclusions of the District Court are inexplicable in light of the record. First, the District Court, in referring to petitioners' expert's analyses stated that the regressions on which petitioners principally relied did not include job title. Pet. App. 119a. Yet the District Court expressly noted that in other regressions in which petitioners did include job title, a statistically significant disparity was noted. Second, the District Court stated that "the single most important factor in determining salaries for the Extension Service professional staff is job performance." *Id.*, at 134a. Yet the District Court failed even to note that respondents' regression analysis for 1975 which included a performance variable showed an even greater disparity in salary than did petitioners'.

Third, the District Court complained about the inclusion of the County Chairmen in petitioners' regression analysis, fearing that the fact that they were disproportionately white would skew the salary statistics to show whites earning more than blacks. Yet, because the regressions controlled for job title, adding County Chairmen as a variable in the regression would simply mean that the salaries of white County Chairmen would be compared with those of nonwhite County Chairmen. In any event, respondents' own regression at trial excluded County Chairmen and revealed a differential between black and white salaries.

Finally, the District Court listed nine variables that it believed were not accounted for in petitioners' regressions. See *id.*, at 133a. It did not, however, determine whether these variables were included in the evidence in other respects. For example, several of the "missing" variables relate to county-to-county variations, while others relate to performance, a variable expressly included in respondents' own regression.

maker Clubs on or after November 18, 1971;[16] and as a defendant (3) all County Commissioners in North Carolina who held that position on or after November 18, 1971. 751 F. 2d, at 667. The Court of Appeals upheld the District Court's denial of class certification.

## A

With respect to the class of black employees, the Court of Appeals held that due to the fact that salaries are made up of money from several distinct sources, the Federal Government, the State, and the counties, the "claim of a potential plaintiff against one county will not be typical of the claim of another potential plaintiff against a different county." *Id.*, at 668.[17] It applied the same reasoning to the employees' charge of discrimination in the hiring of County Chairmen. *Ibid.* Yet the claims here were not asserted solely against the counties; they were asserted also against the Extension Service. And, as against the Extension Service, at least, it is clear that the claims of the named plaintiffs were "typical"

[16] Given the Court's disposition on the merits of the claims relating to the 4–H Clubs and the Extension Homemaker Clubs, we agree that the issue whether the District Court erred in refusing to certify a class of club members is now moot.

[17] The Court of Appeals analogized the present case to its decision in *Stastny* v. *Southern Bell Tel. & Tel. Co.*, 628 F. 2d 267 (CA4 1980), "in which we held that promotion and pay decisions subject to almost complete local autonomy in the various offices of Southern Bell throughout North Carolina would not support the typicality requirement under FRCP 23(a)(3) for a statewide class of employees." 751 F. 2d, at 668. The findings of the District Court flatly contradict the Court of Appeals' conclusion that salaries are reached in any "autonomous" fashion or are arrived at by the counties; rather the District Court explained that "[t]he salaries are determined jointly by the Service and the county board of commissioners." App. 77. This finding is supported by the Memorandum of Understanding between the Extension Service and the Boards of Commissioners for the relevant time period. See *id.*, at 162. Of course, that this case may be one in which it is proper to certify a class, is distinct from the question whether county variations serve as a basis for the demonstrated disparities between the salaries of black and white employees.

of other black employees who may have been paid less or denied promotion to chairman. Although it seems likely that the other requirements of Federal Rule of Civil Procedure 23 were met by this class, neither court below expressly considered the issue and we therefore leave that determination to the Court of Appeals on remand.[18]

## B

The Court of Appeals also upheld the District Court's decision not to certify a class of County Commissioner defendants because there "was simply no evidence of any standardized practice among the one hundred separate counties in the state to deprive anyone of any rights solely because of race." Pet. App. 47a–48a. The Court of Appeals was of the view that "to have a proper class of defendants in a case such as this there must be either a statewide rule or practice so that relief is available if the rule or practice is invalid, or the adjudication with respect to a member of a defendant class must as a practical matter be dispositive of the interests of the other members of the class as provided in FRCP 23(b)(1)(B)." 751 F. 2d, at 670. We agree with the Court of Appeals that certification of a defendant class under Rule 23(b)(1)(B) in this case would have been improper. Whether an individual county acted intentionally with the Extension Service in setting salaries or in selecting County Chairmen in a discriminatory manner, is an issue that once decided with respect to a

---

[18] The District Court believed that a "most importan[t]" reason for not certifying this case as a class action was that "it is now settled law that class action certification is inappropriate and unnecessary in pattern and practice suits brought by the EEOC and the government pursuant to Title VII." Pet. App. 44a–46a. It cited our opinion in *General Telephone Co.* v. *EEOC*, 446 U. S. 318 (1980), for this proposition. The District Court misread that opinion. In *General Telephone Co.*, we held that in a pattern-and-practice case the *Government* need not be certified as a representative of the class of alleged victims. That case does not stand for the erroneous proposition that once the Government intervenes in a case brought by private plaintiffs, those plaintiffs lose their right to proceed as a class.

particular county could not "be dispositive of the interests of the other members of the class." The private petitioners have suggested no theory to support any different result.

JUSTICE WHITE, with whom THE CHIEF JUSTICE, JUSTICE POWELL, JUSTICE REHNQUIST, and JUSTICE O'CONNOR join, concurring.

We agree with JUSTICE BRENNAN's concurring opinion explaining the Court's reasoning insofar as the Court vacates the decision of the Court of Appeals. We write separately to affirm the Court of Appeals in rejecting the allegations of discrimination in the operation of 4–H and Homemaker Clubs. Prior to 1965, the Extension Service maintained segregated 4–H and Homemaker Clubs, and it is true that when this suit was started and when judgment was entered there were a great many all-white and all-black clubs. However, it is undisputed that in response to the Civil Rights Act of 1964 the Service discontinued its segregated club policy and opened any club, then existing or newly organized, to any otherwise eligible person regardless of race. The District Court could find no evidence of any discrimination since that time in either services or membership and concluded as a matter of fact that any racial imbalance existing in any of the clubs was the result of wholly voluntary and unfettered choice of private individuals. App. to Pet. for Cert. in No. 85–93, p. 172a. The court found that "the Extension Service has had a policy that all voluntary clubs be organized without regard to race and that each club certify that its membership is open to all persons regardless of race; that it instructs its agents to encourage the formation of new clubs without regard to race; that it publishes its policies in the media; that all of its club work and functions above the local community level are being conducted on a fully integrated basis; that its 4–H camps are fully integrated and have been for over ten years; and that no person has been denied membership in any club on account of race." *Id.*, at 181a. The Court of Appeals did

not disturb any of the findings of the District Court and affirmed its judgment with respect to the Clubs.

In view of the District Court's findings, this case presents no current violation of the Fourteenth Amendment since the Service has discontinued its prior discriminatory practices and has adopted a wholly neutral admissions policy. The mere continued existence of single-race clubs does not make out a constitutional violation. As the District Court found, one's choice of a Club is entirely voluntary. *Green* v. *School Board of New Kent County,* 391 U. S. 430 (1968), held that voluntary choice programs in the public schools were inadequate and that the schools must take affirmative action to integrate their student bodies. It was the effective predicate for imposing busing and pupil assignment programs to end dual school systems, but it has no application to the voluntary associations supported by the Extension Service. Even if the Service in effect assigned blacks and whites to separate clubs prior to 1965, it did not do so after that time. While schoolchildren must go to school, there is no compulsion to join 4–H or Homemaker Clubs, and while school boards customarily have the power to create school attendance areas and otherwise designate the school that particular students may attend, there is no statutory or regulatory authority to deny a young person the right to join any Club he or she wishes to join. Nor does the Constitution require more than what the District Court and the Court of Appeals found the Service has done in this case to disestablish segregation in its Clubs. Our cases requiring parks and the like to be desegregated lend no support for requiring more than what has been done in this case. And however sound *Green* may have been in the context of the public schools, it has no application to this wholly different milieu. We agree with the submission of the United States in this respect.

Petitioners rely on the Department of Agriculture regulation requiring the Service to take "affirmative action" to overcome the effects of prior discrimination in its programs.

But the Service has taken affirmative action to change its policy and to establish what is concededly a nondiscriminatory admissions system, and it is the position of the United States and the federal parties that there has been full compliance with the regulation. In view of the deference due the Department's interpretation of its own regulation, we cannot accept petitioner's submission that the regulation has been violated.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting in part.

I

The Court rejects the private petitioners' claim that the Extension Service had a duty under the Fourteenth Amendment and the regulations promulgated under Title VI of the Civil Rights Act of 1964 to desegregate the 4–H and Extension Homemaker Clubs in North Carolina. The Court concludes that the "Constitution . . . require[s no] more than what the District Court and the Court of Appeals found the Extension Service has done in this case to disestablish segregation in its 4–H and Extension Homemaker Clubs," *ante*, at 387–388, although the Court does not identify precisely what it is that has been done. The Court of Appeals determined that respondents' constitutional duty has been satisfied if a plaintiff cannot point to a minority individual who has been discriminated against with respect to membership in a 4–H or Extension Homemaker Club. In upholding the Court of Appeals in this respect, the Court joins the Extension Service in winking at the Constitution's requirement that States end their history of segregative practices, and callously thwarts an effort to eliminate "the last vestiges of an unfortunate and ignominious page in this country's history." *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 418 (1975). JUSTICE WHITE's terse opinion offers only feeble excuses for

this departure from the Court's historic commitment to the eradication of segregation in this country. I dissent.

The 4–H and Youth Program in North Carolina is one of the major educational programs of the Extension Service. The Extension Service also operates an extension home economics program in each of the 100 counties of North Carolina, a program which also renders important assistance to the citizens of the State. Through these programs the Extension Service organizes and services 4–H and Extension Homemaker Clubs throughout the State. At trial, the Director of the Extension Service, Thomas Blalock, testified that 4–H agents recruit, train, and utilize volunteers to establish 4–H Clubs and Extension Homemaker Clubs; and that extension agents provide educational materials and training to the 4–H Clubs. Tr. 4196, 4199, 4217. Similarly, agents regularly meet with the Extension Homemaker Clubs, give lessons to them, and train individual club members to give home economics lessons to their members. App. to Pet. for Cert. in No. 85–93, p. 16a (hereinafter Pet. App.). See also Tr. of Oral Arg. 42. Federal law restricts the use of the name "4–H Club" to clubs affiliated with state extension services and certain other organizations. 7 CFR §§ 8.1–8.10 (1985).

The District Court found that prior to the early 1960's "[4–H] clubs were organized in the public schools and county 4–H agents would meet with the clubs during school hours and present educational programs to them. Thereafter, the clubs were moved out of the schools and were organized on a community basis with adult volunteers serving as leaders of the clubs." Pet. App. 19a. It is not disputed that prior to the merger of the black and white branches of the Extension Service separate Clubs were operated for blacks and whites. Tr. of Oral Arg. 37. Evidence introduced at trial demonstrated that in 1965, when the clubs were segregated, there were 1,474 all-white 4–H Clubs, out of a total of 2,687 (54.9%), GX 32, CA App. 1806; in 1980, 1,348 clubs out of a total of 3,448 (39.1%) remained all white. GX 11. In 1980, in

racially mixed communities, there were 580 all-white clubs, 296 all-black clubs, and 4 clubs of American Indians, for a total of 880 single-race clubs, *ibid.;* this, as compared to 892 in 1972, represented a decline of only 1.3% in the number of single-race clubs in eight years, GX 33, CA App. 1807.[1] With respect to Extension Homemaker Clubs, in 1972—the last year for which the Extension Service kept statistics— 98.8% of all the Extension Homemaker Clubs were either all white or all black.   App. 103.

## II

The private petitioners and the United States took the position at trial that respondents are under an affirmative obligation to eliminate the effects of *de jure* segregation within the Extension Homemaker and 4–H Clubs.   The United States based its argument on Title VI of the Civil Rights Act of 1964 and the regulations promulgated thereunder.   Proposed Conclusions of Law of Plaintiff-Intervenor

---

[1] In 1980 only 1,442, or 42% of the clubs were integrated—that is, contained one or more members of a minority group.   GX 11.   The number of integrated clubs in mixed communities, meanwhile, had grown from 586 in 1972 to 1,142 in 1977, so that in 1972, 39.6% of the units in mixed communities were integrated and in 1977, 56% of the clubs were so.   App. 134.

The United States' proposed findings of fact with respect to both the 4–H Clubs and the Extension Homemaker Clubs pointed to testimony by several witnesses that they were aware of *no* mixed clubs in their respective counties even though many of these clubs were in racially mixed communities.   Post Trial Findings of Fact, Conclusions of Law and Proposed Decree of Plaintiff-Intervenors in Civ. Action No. 2879 (EDNC), ¶¶ 245, 255. In an apparent attempt to detract from the accuracy of respondents' statistics, and thus show that there had been even less progress than the statistics indicated, the United States pointed out that the data offered were prepared entirely by the defendants, and were based solely on reports made by county 4–H agents, who were aware of the stated policy of the Extension Service to encourage integration of clubs.   The United States also claimed no effort was made to monitor the accuracy of these reports. *Id.,* ¶¶ 250–254.   Because of the legal theory adopted by the courts below, no findings of fact were ever made with respect to the significance or accuracy of these data.

United States in Civ. Action No. 2879 (EDNC), pp. 3, 19–20. The private petitioners based their claim on both the Constitution and Title VI. Complaint 23.

The trial judge rejected the argument. He was persuaded that there had been no violation of either the applicable regulations or the Constitution because no witness had claimed that membership in the clubs was anything but voluntary, "or that he or she had been denied membership in any such club on the basis of race; or that he or she had ever been subjected to discrimination with respect to any services offered by the Extension Service." Pet. App. 168a. Similarly, the Court of Appeals rejected the challenge relating to the racial composition of the 4–H and Extension Homemaker Clubs in a footnote stating that "[a]bsent proof of alleged racial discrimination, the mere existence of all white and all black 4–H and Extension Homemaker Clubs in some racially mixed communities violates neither Title VI nor the equal protection clause." 751 F. 2d 662, 687, n. 128 (CA4 1984). The court noted that the record was devoid of proof of discrimination with respect to services provided by the clubs, and that there was insufficient proof of discrimination with respect to membership in any club. *Ibid.*

The private petitioners here reassert their position. They rely on regulations promulgated by the United States Department of Agriculture (USDA) under Title VI of the Civil Rights Act of 1964. In particular, they rely on 7 CFR § 15.3(b)(6)(i) (1985), which states:

> "In administering a program regarding which the recipient has previously discriminated against persons on the ground of race, color, or national origin, the recipient must take affirmative action to overcome the effects of prior discrimination."

In addition, they contend that the decision of this Court in *Green* v. *School Board of New Kent County*, 391 U. S. 430 (1968), supports the proposition that the fact that membership in the clubs is no longer officially based on race does not

relieve the Extension Service of its affirmative constitutional duty to dismantle the discriminatory system that it had created.

## III

Respondents have never attempted to explain—either in the Court of Appeals or in this Court—how they are in compliance with this regulation, although they do not challenge its application to them. See, *e. g.*, Brief for Respondents 50. Inexplicably, the Court of Appeals did not even mention the regulation; and although the District Court mentioned it, that court simply ignored its obvious import. Pet. App. 169a–173a. The United States takes a position here contrary to that which it took at trial.[2] It contends that respondents have fully complied with the regulation because they have engaged

_____

[2] At the conclusion of trial in 1982 the United States sought inclusion of the following paragraphs in a decree to be entered by the District Court:

"20. The Defendants shall take the following affirmative steps with regard to extension services in order to eliminate the effects of the past and in order to assure an equal opportunity for participation in [Extension Service] services in the future.

"21. The Defendants shall within 90 days of this Order identify and define communities within counties according to the regulations and guidelines set forth by the U. S. Department of Agriculture and serve supporting documentation upon attorneys for the Plaintiffs and Plaintiff-Intervenors. . . .

. . . . .

"22. Consistent with the above paragraph Defendants are ordered to implement the "All Reasonable Efforts" provisions of U. S. Department of Agriculture regulations and implementing guidelines as they relate to the desegregation of 4–H and Extension Homemaker clubs in integrated communities.

"23. Defendants shall make every effort to ensure that all community 4–H and Extension Homemaker clubs shall be fully desegregated.

"24. One year from the date of this Order, Defendants shall cease all contact with clubs which are still operated on a segregated basis, and have not shown that they have taken all reasonable efforts desegrated [sic] as required by para. 22 above." Proposed Decree of Plaintiff-Intervenors United States et al. in Civ. Action No. 2879 (EDNC), p. 9.

The United States did not appeal this issue to the Court of Appeals.

in "affirmative action to ensure that [their] program is open to all on an equal basis and that it avoids subsequent segregative conduct." Reply Brief for Federal Petitioners 18, n. 18. The Court similarly dismisses the regulation in a paragraph asserting that a mere change in policy constitutes affirmative action. I disagree.

It is absurd to contend that the requirement that States take "affirmative action" is satisfied when the Extension Service simply declares a neutral admissions policy and refrains from illegal segregative activities. Moreover, the Court simply ignores the portion of the regulation that plainly requires that affirmative action be taken to "*overcome the effects of prior discrimination.*" There is no room to doubt, and the Court does not even bother to argue otherwise, that one of the *effects* of prior discrimination is the legacy of single-race Clubs that still exist in North Carolina.[3]

## IV

It is not surprising that the USDA regulations require affirmative steps to eliminate the vestiges of official discrimination; the Constitution requires no less. In *Green* we rejected the argument that a "freedom of choice" plan whereby students were able to choose which of two schools in the school district to attend satisfied the affirmative obligation of the School Board to desegregate its schools, because it failed to achieve the racially nondiscriminatory school system mandated by *Brown* v. *Board of Education,* 349 U. S. 294 (1955). In *Green,* we noted that "[i]n the context of the state-imposed segregated pattern of long standing, the fact that in 1965 the Board opened the doors of the former 'white' school to Negro children and of the 'Negro' school to white children merely

---

[3] Indeed, guidelines promulgated by the USDA, also relied on by the United States, support the view that something more than passive non-obstructionism was required of the Extension Service here. With respect to the Extension Service Clubs, those guidelines provided, for example, that the Extension Service "take steps to assure that membership of such clubs is interracial in composition." CA App. 1933, 1949.

begins, not ends, our inquiry whether the Board has taken steps adequate to abolish its dual, segregated system." 391 U. S., at 437.

Respondents agree with the courts below that in the absence of any evidence of specific instances of discrimination, the State cannot be compelled to act to eliminate the effects of the prior *de jure* segregation. They cite no support for this proposition. This analysis is plainly wrong. It ignores the history of the Extension Service's administration of a segregated system of clubs. Our cases clearly demonstrate that prior *de jure* segregation gives rise to an affirmative duty to desegregate which cannot be met simply by a demonstration that no black person has been turned away from an all-white club. See *Gilmore* v. *City of Montgomery*, 417 U. S. 556, 566–567 (1974) ("The city was under an affirmative constitutional duty to eliminate every custom, practice, policy or usage reflecting an impermissible obeisance to the now thoroughly discredited doctrine of separate but equal. . . . This obviously meant that discriminatory practices in Montgomery parks and recreational facilities were to be eliminated root and branch") (internal quotation marks omitted); *Keyes* v. *School District No. 1, Denver, Colorado*, 413 U. S. 189, 213 (1973) ("If the District Court determines that the Denver school system is a dual school system, respondent School Board has the affirmative duty to desegregate the entire system 'root and branch'"); *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1, 15 (1971) ("The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation"); *id.*, at 32 (discussing "affirmative duty to desegregate"); *Green*, 391 U. S., at 437 ("School boards such as the respondent then operating state-compelled dual systems were nevertheless clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch"). Indeed, before today the rule was that a "court

has not merely the power but the *duty* to render a decree that will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana* v. *United States*, 380 U. S. 145, 154 (1965) (voting rights context) (emphasis added). See also *Carter* v. *Jury Comm'n of Greene County*, 396 U. S. 320, 340 (1970) (jury selection context).

The United States agrees that *Green* v. *School Board of New Kent County, supra,* "held that a public entity which has engaged in de jure racial segregation has an affirmative duty to desegregate . . . ." Reply Brief for Federal Petitioners 16. However, as it does with respect to the applicable regulations, the United States argues that this duty is fulfilled where admissions are normally determined by voluntary choice, so long as the State simply establishes a genuinely race-neutral admission system and refrains from segregative conduct. *Id.,* at 16–18.

The United States contends that the nature of the Clubs somehow renders the State's affirmative duty one that can be fulfilled by taking ineffective actions that border on inaction—declaring a neutral admissions policy and refraining from segregative activities. It submits that the school context is distinguishable from the present context because public officials did not assign youths to clubs.[4] The flaw in this

---

[4] The United States argues:

"Where public officials do not assign persons to a particular program, there is no state-controlled attendance pattern, discriminatory or otherwise, to undo or redraw. Thus, unlike elementary and secondary education, affirmative action to assure a genuine and complete termination of all discrimination in activities affecting admissions will not leave in place any discriminatory conditions caused by previous state-imposed segregation. Such a genuinely race-neutral policy will, absent any subsequent conduct that contributes to segregation, fully dismantle the dual admission system because it will restore to the victims of discriminatory conduct (and provide to others) the system mandated by the Constitution, *i. e.,* one in which each person has an equal opportunity to participate in government activi-

argument is that public officials did, in effect, assign youths to clubs during the period of *de jure* segregation. Prior to the early 1960's, the 4–H Clubs were organized in the public schools, Pet. App. 19a, which were at that time, of course, still segregated. Tr. 4203–4204. Thus, those who wanted to join 4–H were, in effect, "assigned" to join the Club in their segregated school.[5] It is the racial segregation resulting from this practice that the State is under a duty to eradicate.

As a result, this case is in fact indistinguishable from *Green*, in which the State had operated a school system that assigned youths to schools according to race, and argued that a plan whereby students could choose which school to attend satisfied the State's obligation under the Fourteenth Amendment. The United States' argument here is identical to the argument of the School Board in *Green:* that "freedom of choice" serves to relieve the State of its *affirmative* duty to desegregate. *Green* squarely rejected that argument. Rather, we emphasized in *Green:*

> "'Freedom of Choice' is not a talisman; it is only a means of a constitutionally required end—*the abolition of the system of segregation and its effects*. If the means prove effective, it is acceptable, but if it fails to undo segregation, other means must be used to achieve this end." 391 U. S., at 440 (quoting *Bowman* v. *County School Board*, 382 F. 2d 326, 333 (CA4 1967) (Sobeloff, J., concurring) (emphasis added)).

---

ties free from discrimination and racial separation attributable to state action." Brief for Federal Petitioners 42–43.

[5] It is not clear whether the Extension Homemaker Clubs were also organized in the segregated schools, but that matters little, given that it is not disputed that these clubs too were operated on a segregated basis. Thus, as with the 4–H Clubs, although the Extension Service did not "assign" people to Homemaker Clubs, those who did join were in effect "assigned" to join a club of a particular race.

JUSTICE WHITE asserts that *Green* "has no application to the voluntary associations supported by the Extension Service," because "[e]ven if the Service in effect assigned blacks and whites to separate clubs prior to 1965, it did not do so after that time." *Ante,* at 408. In addition, JUSTICE WHITE asserts that this case is somehow distinguishable from *Green* because "while school boards customarily have the power to create school attendance areas and otherwise designate the school that particular students may attend, there is no statutory or regulatory authority to deny a young person the right to join any Club he or she wishes to join." *Ante,* at 408. These observations do not advance the Court's position, however; they simply demonstrate why *Green* is on *all fours* with this case.

The second asserted basis for the Court's holding is that "[w]hile schoolchildren must go to school, there is no compulsion to join 4–H or Homemaker Clubs . . . ." *Ante,* at 408. It may also be true that, while children learn mathematics at school, they do not do so in 4–H or Homemaker Clubs. But that distinction is about as relevant as the Court's to the issue before us. Nothing in our earlier cases suggests that the State's obligation to desegregate is confined only to those activities in which members of the public are compelled to participate. On the contrary, it is clear that the State's obligation to desegregate formerly segregated entities extends beyond those programs where participation is compulsory to voluntary public amenities such as parks and recreational facilities. See, *e. g., Gilmore* v. *City of Montgomery,* 417 U. S. 556 (1974); *Watson* v. *Memphis,* 373 U. S. 526 (1963); *Dawson* v. *Mayor and City Council of Baltimore,* 220 F. 2d 386, aff'd, 350 U. S. 877 (1955); *Muir* v. *Louisville Park Theatrical Assn.,* 347 U. S. 971 (1954).

Rather than attempt to justify the result it reaches with any reasoning or support from precedent, the Court adopts the reasoning of JUSTICE WHITE, who simply states a conclusion that "however sound *Green* may have been in the con-

text of public schools, it has no application to this wholly different milieu." *Ante,* at 408. We are left to wonder why this is so. While I agree that the remedy ultimately provided might properly vary in different contexts, I can see no justification in logic or precedent for relieving the State of the overall obligation to desegregate in one context while imposing that obligation in another. Yet this is precisely what the Court does by blindly ignoring the perpetuation of state-sponsored racial discrimination in the clubs run by the Extension Service.

The Court may be under the same misapprehension as was the District Court. That court characterized the problem facing it and the Extension Service in grave terms:

> "The simple truth is that in the matter of these one-race clubs the Extension Service has been faced with a dilemma which admits of no easy, readily available solution. On the one hand it has been under constant pressure from the government to eliminate racially segregated clubs or terminate services to them. On the other hand there is the stark reality that in North Carolina as well as all other states integration of the races more frequently than not meets with strong resistance.

> "The choice thus posed is whether it is better that the Extension Service continue to provide its much needed services to well over 100,000 North Carolina members while striving to achieve full integration of the clubs or that it withdraw such services altogether as the government would have it do. The Extension Service has opted for the former, and in so doing this court does not perceive that it has violated the rights of anyone under any law." Pet. App. 182a–185a.

JUSTICE WHITE states that *Green* was the "effective predicate for imposing busing and pupil assignment programs to end dual school systems . . . ." *Ante,* at 408.

The District Court, however, was certainly not limited in crafting a remedy requiring the Extension Service to cut off

funds and services to one-race Clubs. Nor, as the Court seems to suggest, was the District Court required to initiate busing or club member assignment. Rather, in the exercise of its equitable powers, a court may require any of a broad variety of measures, provided they prove to be effective in desegregating the Clubs. See 391 U. S., at 439–441. The delineation of the precise measures to be taken by the Extension Service on this record is a task that should be left to the District Court in the first instance. *Id.*, at 439. It is true that *Green* supports the proposition that where the vestiges of the *de jure* system have all but disappeared, the limited measures proposed by the United States in this case may fulfill that duty. Thus, in *Green*, we said that, "[a]lthough the general experience under 'freedom of choice' to date has been such as to indicate its ineffectiveness as a tool of desegregation, there may well be instances in which it can serve as an effective device." *Id.*, at 440. On this record, however, it hardly appears to have been an effective device.

I would hold simply that the Government's position that the Extension Service's affirmative duty can be fulfilled on the facts of this case through passive means is erroneous, as is respondents' view that the State can be conclusively determined to have fulfilled its duty as long as no black can point to a blatant discriminatory act. To the extent that the Court reads *Green* and the Constitution to require anything less, it is wrong.