GREGORY, Circuit Judge,
dissenting in part:
Although I agree with most of the majority’s analysis, I write separately because I cannot concur in the disparate impact analysis contained in part VII(B). There, the majority affirms a grant of summary judgment against Ms. Anderson on her disparate impact claim despite the fact that she produced evidence showing a statistically significant variation between the number of African-Americans who apply and the number who are successful at both the second and third stages of the CBPS. The majority first finds that because Ms. Anderson’s evidence challenging the subjective nature of the second and third stages of the CBPS failed to control for all subjective variables potentially taken into account in the interview and hiring decisions, she failed to establish the causation element of her prima facie burden. Second, the majority finds that even if Ms. Anderson had in fact satisfied her prima facie burden, her claims would fail because she cannot make the requisite McDonnell Douglas showing that Westinghouse’s legitimate non-discriminatory rationale was mere pretext for a racially discriminatory decision.
Because I cannot agree with either of these contentions, I respectfully dissent from that particular part of the majority opinion.
I.
Under Title YII of the Civil Rights Act of 1991:
It shall be an unlawful employment practice for an employer' — •
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual’s race, color, religion, sex, or national origin.
42 U.S.C. § 2000e-2 (2005). From inception, it was clear that the act covered cases of disparate treatment — where one party was intentionally discriminated against by an employer on the basis of race, color, religion, sex, or national origin. See Int. Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (“Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII.”).
However, in the seminal case of Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Court held that “[t]he Act proscribes not only overt discrimination but also practices that *277 are fair in form, but discriminatory in operation.” See Peters v. Jenney, 327 F.3d 307, 321 n. 17 (4th Cir.2003) (“Title VII prohibits practices that are not intentionally discriminatory but that have a disparate impact on members of a particular racial group.”). As amended in 1991, Title VII now explicitly recognizes disparate impact claims. 42 U.S.C. § 2000e-2(k). Section 2000e-2(k) states as follows:
(1)(A) An unlawful employment practice based on disparate impact is established under this subchapter only if—
(i) a complaining party demonstrates that a respondent 'uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or
(ii) the complaining party makes the demonstration described in subpara-graph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.
42 U.S.C. § 2000e-2(k).
Similar to its analysis of disparate treatment, the Supreme Court has laid out a burden shifting scheme for disparate impact actions. See Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 994-95, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). Under the disparate impact burden-shifting scheme, the first step is for the plaintiff to establish a prima facie case of disparate impact. See id. at 994, 108 S.Ct. 2777. To make this prima facie showing, a plaintiff must (1) identify a specific policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal relationship between the two. See id. at 994-95, 108 S.Ct. 2777. Upon successfully presenting a prima facie case, the burden then shifts to the employer to “demonstrate that the challenged practice is job related for the position in question and consistent with business necessity.” 42 U.S.C. § 2000e-2(k)(l)(a)(i); see Walls v. City of Petersburg, 895 F.2d 188, 191 (4th Cir.1990)(“[T]he employer must then demonstrate that ‘any given requirement [has] a manifest relationship to the employment in question,’ in order to avoid a finding of discrimination.”). Finally, even if the employer makes a sufficient showing that the challenged practice is “job related,” the plaintiff may prevail by showing the existence of an equally effective alternative practice that eliminates the disparate impact and the employer refuses to adopt this alternative. 42 U.S.C. § 2000e-2(k)(l)(a)(2); see Allen v. City of Chicago, 351 F.3d 306, 311-12 (7th Cir.2003)(“If the defendant makes this showing, plaintiffs can still prevail by demonstrating that an alternative employment practice exists, and the defendant refuses to adopt it.”).
II.
Contrary to the majority, I believe that Ms. Anderson did in fact satisfy her prima facie burden for a Title VII disparate impact claim. Therefore, I will address each step of the analysis in turn.
A.
As noted earlier, the first step in establishing a prima facie case is the identification of a specific policy or practice. Here, Ms. Anderson challenges the second and third stages of the Competency Based Posting System (“CBPS”)[1] as having a disparate impact on African-American employees. Ms. Anderson specifically challenges the subjective decision-making *278 involved in each stage. The majority “assumes arguendo” that by challenging these stages Ms. Anderson identified a specific employment practice.
In Watson, the Court addressed the issue of whether a disparate impact analysis could properly be applied to subjective criteria.[2] See Watson, 487 U.S. at 989, 108 S.Ct. 2777. There, the Court held that “subjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate cases.” Id. at 991, 108 S.Ct. 2777. “We are persuaded that our decisions in Griggs and succeeding cases could largely be nullified if disparate impact analysis were applied only to standardized selection practices.” Watson, 487 U.S. at 989, 108 S.Ct. 2777. The Court continued on to conclude that:
If an employer’s undisciplined system of subjective decision-making has precisely the same effects as a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VTI’s proscription against discriminatory actions should not apply. In both circumstances, the employer’s practices may be said to “adversely affect [an individual’s] status as an employee, because of such individual’s race, color, religion, sex, or national origin.” 42 U.S.C. § 2000e-2(a)(2).
Id. at 990-991, 108 S.Ct. 2777.
In this case, I would find that Ms. Anderson did in fact satisfy the first element of her prima facie burden. Ms. Anderson challenged the second and third stages of the CBPS system, both of which entail an interview panel subjectively rating qualified candidates across a number of subjective criteria. The second stage is a screening stage, where the applications of applicants who are found to meet the minimum requirements by the Human Resources department are forwarded to the manager of the department with the opening. That person, either by themself or in conjunction with two others, then screens all the applications with “core competencies” (teamwork, leadership, communications, employee development, business results and self management) and “functional competencies” in mind, to find the most qualified candidates to interview for the position. The third stage of the process involves the actual interviews of those candidates selected. Interviews are conducted by a three-person panel, during which each member of the panel evaluates the candidate in writing according to the above criteria and any other relevant characteristics. After all interviews are conducted, the panel then selects who it believes is the best person for the position.
Ms. Anderson is not required to challenge a more specific aspect of the hiring process, particularly when she is challenging a subjective process. In Rose v. Wells Fargo & Co., 902 F.2d 1417, 1420, 1424-25 (9th Cir.1990), the Ninth Circuit held that where “[e]mployment decisions as to which jobs would be eliminated and as to who would fill the remaining positions was essentially left to the discretion of the various bank departments,” such a policy was a specific employment practice subject to disparate impact analysis, even where the managers were instructed to consider fac *279 tors such as longevity and performance. Similarly, in this case, while those making the decisions in the second and third stages of the CBPS were instructed to evaluate candidates according to certain qualities, whether the applicants showed any aptitude for the guideline' qualities was an entirely subjective evaluation. After all, how does one truly quantify or measure “teamwork” or “communications” without making a wholly subjective assessment?
In its attempt to distinguish cases such as Watson and Rose, I believe that the majority overstates the level to which the discretion present in this case was cabined by the process. Focusing on the Watson Court’s language describing subjective employment practices as “unchecked discretion” and as an “undisciplined system of subjective decision making,” the majority argues that because the discretion in this case was not unfettered, the holdings of Watson and Rose are not applicable here. The majority finds support for this position in the fact that the decision makers were instructed to consider core and functional competencies when making their decisions. However, the majority’s ’focus on the Watson Court’s language describing subjective employment practices as “unchecked discretion” and as an “undisciplined system of subjective decision making,” is misplaced. The crux of the Watson decision is that “disparate impact analysis is in principle no less applicable to subjective employment criteria than to objective or standardized tests” because “[i]n either case, a facially neutral practice, adopted without discriminatory intent, may have effects that are indistinguishable from intentionally discriminatory practices.” Watson, 487 U.S. at 990, 108 S.Ct. 2777. Later in the Watson opinion, the Court then repeated this position, stating “[i]f an employer’s undisciplined system of subjective decision making has precisely the same effects as a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VII’s proscription against discriminatory actions should not apply.” Id. at 990-91, 108 S.Ct. 2777. The clear focus of the Watson opinion is not the degree to which subjective discretion is unfettered, but instead the fact that both objective and subjective criteria can have deleterious effects that are indistinguishable from intentionally discriminatory practices. That was the reason the Court concluded “that subjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate ’ cases.” Id. at 991, 108 S.Ct. 2777.
Because I believe that the challenged practices are undisputably subjective in nature, I see no reason not to apply the rule of Watson in this case, and find that Ms. Anderson identified a specific employment practice.
B.
Ms. Anderson was next required to show a causal nexus between the challenged practice and the disparity. The statute itself mandates that the plaintiff demonstrate that the employer “uses a particular employment practice that causes a disparate impact.” 42 U.S.C. § 2000e-2(k); see Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 657, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989)(“a Title VII plaintiff does not make out a case of disparate impact simply by showing that, ‘at the bottom line,’ there is racial imbalance in the work force. As a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has *280 created the disparate impact under attack.”)-
As an initial matter, it is well recognized that statistical evidence may be employed in disparate impact cases to show the existence of a disparity. See New York City Transit Auth. v. Beazer, 440 U.S. 568, 584, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979); Walls, 895 F.2d at 191 (“A plaintiff may use statistical evidence to establish a pri-ma facie violation of Title VII.”). As the Court noted in Watson, the term “disparity” has “never been framed in terms of any mathematical formula.” Watson, 487 U.S. at 994-95, 108 S.Ct. 2777. Further, the Court has never “suggested that any particular number of standard deviations can determine whether a plaintiff has made out a prima facie case in the complex area of employment discrimination,” but has instead endorsing a case-by-case approach. Id. at 995 n. 3, 108 S.Ct. 2777.
Ms. Anderson presented the testimony of Dr. Edwin Bradley, Ph.D., CEO of Quantitative Research Associates. Specifically, Dr. Bradley found that at the second screening stage, a statistically significant under-representation (-6.64 standard deviations) of African-Americans existed when the pool of applicants meeting the minimum qualifications for the postéd position was compared to the applicants actually selected for an interview. J.A. 1645. Similarly, Dr] Bradley found that at the third screening stage, a statistically significant under-representation (-2.38 standard deviations) of African-Americans existed when the pool of applicants selected for an interview was compared to those selected for appointment. J.A. 1645.
Despite this, the district court concluded and the majority concludes that because Ms. Anderson’s statistical evidence failed to control for all variables that may have impacted the decisions made at the challenged stages, it is insufficient to establish causation. Specifically, the majority states:
“This evidence does not show that the reason black applicants failed to proceed at the interview selection stage and position selection stage was their race. Factors such as presentation in the interview, answers to interview questions, demeanor, and ability demonstrated in the interview of course entered into the judgment of the members of the panel as to the candidate who received a position that was being filled.”
Ante at 266.
However, statistical evidence does not have to control for every single variable in order to be sufficient. As the Supreme Court stated in Bazemore v. Friday, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), “it is clear that a regression analysis that included less than all ‘measurable variables’ may serve to prove a plaintiffs case. A plaintiff in a Title VII suit need not prove discrimination with scientific certainty; rather his burden is to prove discrimination by .a preponderance of the evidence.”[3] Id. at 400, 106 S.Ct. 3000. Therefore, requiring Ms. Anderson to account for every possible variable that may *281 have impacted the outcome goes beyond Supreme Court formulations of the plaintiffs burden in a Title VII disparate impact case. In Watson, a case where the Court faced a challenge to subjective practices, the Court required that the plaintiff “offer evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group,” and importantly noted that its formulations have “consistently stressed that statistical disparities must be sufficiently substantial that they raise such an inference of causation.” Watson, 487 U.S. at 995, 108 S.Ct. 2777. Similarly, in Albemarle, the Court required the plaintiff to show “that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants.” Albemarle, 422 U.S. at 425, 95 S.Ct. 2362; see also Dothard, 433 U.S. at 329, 97 S.Ct. 2720 (“[T]o establish a prima facie case of discrimination, a plaintiff need only show that the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern.”).
I am of the opinion that Ms. Anderson satisfied her burden because Mr. Bradley’s testimony is sufficient to show that the stages in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants. In fact, the district court recognized that Dr. Bradley’s analysis demonstrated a “statistically significant variation between the number of African-Americans who apply and the number who are successful at both the second and third step of the CBPS process.” J.A. 12228. As the CBPS process is set up, all candidates who made it to stage two of the process possessed at least the minimum qualifications for the posted position. Further, all candidates who received a stage three interview were not only minimally qualified for the position in question, but were also found by the relevant department manager to be the most qualified of all applicants. Yet despite this, Dr. Bradley found a statistically significant under-representation of African-Americans when comparing the applicant pools to the successful candidates at the end of each stage.
Given these facts, I am at a loss to understand how the majority finds that Ms. Anderson’s statistics fail to show that the stages in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants. These statistics present more than just a disparity in Westinghouse’s work force; they present evidence that the challenged stages have caused the exclusion of African-Americans because of their membership in a protected class. And this evidence, by virtue of the nature of the hiring process itself, controlled for the major factor in the hiring process that could be controlled for, namely that of qualification. For example, despite the fact that at stage three only the most qualified candidates are interviewed, Dr. Bradley found that African-Americans were under-represented in the class of those who actually received appointments after interviewing. I recognize that this court is under no obligation to “assume that plaintiffs’ statistical evidence is reliable.” Watson, 487 U.S. at 996, 108 S.Ct. 2777. However, where a party shows that there is a statistically significant under-representation of African-Americans successfully completing a challenged subjective stage of a hiring-process, despite a number of qualified African-American candidates,[4] I fail to see *282 how an inference of causation for the purposes of establishing a prima facie case of disparate impact has not been shown.
Additionally, by faulting Ms. Anderson for not controlling for certain variables, the majority is in essence faulting her for not controlling for the exact factor that she is here challenging as causing a disparate impact — the subjective aspects of stages two and three. The majority states that “[f]actors such as presentation in the interview, answers to interview questions, demeanor, and ability demonstrated in the interview” are factors that entered in the ultimate hiring decisions, and that therefore in order to show causation any statistical evidence must control for these factors. Ante at 266. However, these are all subjective evaluations, and exactly what Ms. Anderson is challenging. The majority points out that Ms. Anderson did not account for the evaluation of core and functional competencies. But again, the evaluation of the core competencies, and any relevant functional competencies, is largely a subjective evaluation. While faulting Ms. Anderson for not controlling for these factors, the majority never explains how such control would even be possible. As I questioned earlier, how does one quantify “teamwork” or “leadership,” such that it can be controlled for in a statistical setting. The very nature of the subjective process challenged makes such control impossible.
As such, because Ms. Anderson identified a specific practice, demonstrated the existence of a disparity and established a causal nexus between the two, I would hold that Ms. Anderson did in fact state a prima facie case of disparate impact.
III.
Despite its belief that Ms. Anderson failed to satisfy her prima facie burden, the majority assumes arguendo that she has and continues with its disparate impact analysis. According to the majority:
the question is whether the proffered circumstantial evidence of discriminatory impact is sufficient to satisfy the McDonnell Douglas framework of proof.... Under this framework the plaintiff must first establish a prima fa-cie case of discrimination. Then, the defendant must respond with evidence that it acted with a legitimate, nondiscriminatory reason. If the defendant makes this showing, then the plaintiff must “present evidence to prove that the defendant’s articulated reason was pretext for unlawful discrimination.”
Ante at 267. After noting that under McDonnell Douglas the ultimate burden of proving intentional discrimination remains on the plaintiff, the majority finds that Ms. Anderson failed to show that Westinghouse’s legitimate nondiscriminatory reason was mere pretext for intentional discrimination.
In reaching this conclusion, the majority ignores the Supreme Court’s decision in Griggs, the impact of which was to squarely reject the notion that in order to state a claim for employment discrimination the claimant must make a showing of intent. As the Court stated in Griggs, “good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as ‘built in headwinds’ for minority groups and are unrelated to measuring job capability.” Griggs, 401 U.S. at 432, 91 S.Ct. 849.
Disparate impact and disparate treatment are two legally distinct causes of action under Title VII. Disparate treatment requires the plaintiff to prove that the defendant had discriminatory intent or motivation. See Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 986, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). In *283 contrast, disparate impact seeks to ferret out employment practices that are the functional equivalent of. intentional discrimination because they cause significant adverse effects on protected groups, but have no deliberate discriminatory motive. Id. at 986-87, 108 S.Ct. 2777. It is important to note that while the Supreme Court has enunciated burden-shifting schemes for both disparate treatment and disparate impact, the schemes possess critical differences that prevents one from applying either test in the other context. See Lex K Larson, Employment Discrimination § 8.01[2] (2d ed. 2004) (“The principal category of suits to which the McDonnell Douglas formula does not apply is that exemplified by the 1971 case of Griggs v. Duke Power Co.”). As the Court noted in Watson,“[t]he factual issues and the character of the evidence are inevitably somewhat different when the plaintiff is exempted from the need to prove intentional discrimination.” Watson, 487 U.S. at 987, 108 S.Ct. 2777.
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), sets forth the Supreme Court’s burden shifting formula for dealing with the problem of proof in intentional discrimination cases.[5] Under the McDonnell Douglas burden shifting formula, after the plaintiff establishes a prima facie case, “the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee’s rejection.” Id. Should the employer articulate such a reason, the plaintiff must then be afforded an opportunity to show that the articulated reason was merely pretext for a. racially discriminatory decision. Id. at 804-05, 93 S.Ct. 1817.
By finding that Ms. Anderson had failed to show that Westinghouse’s articulated reason was pretext, the majority in essence held that Ms. Anderson had failed to prove intent. However, in the context of her disparate impact claim, Ms. Anderson was under no obligation to prove intent. As the statute itself makes clear, where the employer demonstrates that the challenged practice is job related for the position in question and consistent with business necessity, the plaintiff may still prevail by showing the existence of an equally effective alternative practice that eliminates the disparate impact and that the employer refuses to adopt that alternative. 42 U.S.C. § 2000e-2(k)(l)(a)(2). Nowhere does the statute require a showing of pretext, because pretext points to intent. Therefore, the majority’s application of any such burden to Ms. Anderson is error.
IV.
Disparate impact is more than a mere method of smoking out intentional discrimination. Disparate impact attacks a set of deleterious behaviors that the intent standard fails to capture. By definition, the standard attacks only those practices that have a disparate impact on the employment opportunities of classes protected by Title VII when those practices are not supported by a legitimate business justification or where the same end-goals can be achieved in a less deleterious manner. Given the struggles of this nation, a practice that has a disparate adverse impact on a protected class, and yet either has no legitimate business justification, or can be achieved in a less harmful manner, is not a *284 practice that we should allow to stand. Ultimately, this is a recognition by society that these practices, and their effects, are harmful in their own right. To continue moving a healing society forward, any such practices must be attacked under Title VII with a level of vigor equal to that spent combating intentional discrimination.
With its holdings today, the majority has made the mountain a plaintiff must climb to state a disparate impact claim harder to surmount. Not only has the majority in essence required the plaintiff here to prove causation to a scientific certainty, they have also forced the plaintiff to show intent despite the clear statutory and jurisprudential dictates to the contrary. As I cannot concur with either of these results, I respectfully dissent.

. Specifically, Ms. Anderson challenged steps #9, # 12, # 13 of the CBPS.

. In Watson, the Court noted that its disparate impact jurisprudence had always involved cases in which standardized employment tests or criteria were challenged. Id. at 988. For example, in Griggs the Court faced challenges to high school diploma requirements and aptitude tests. Griggs, 401 U.S. at 432, 91 S.Ct. 849. Similarly, in Albemarle Paper Co. v. Moody, 422 U.S. 405, 427, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Court faced challenges to aptitude tests. Finally, in Connecticut v. Teal, 457 U.S. 440, 445, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982), the Court faced challenges to written examinations.

. The Court's decision in Bazemore has been read as allowing regression analyses that account for the ''major” factors. See e.g. Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 676 (4th Cir.1996) ("While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors 'must be considered unacceptable as evidence of discrimination.' Normally, failure to include variables will affect the analysis’ probativeness, not its admissibility. Importantly, it is clear that a regression analysis that includes less than 'all measurable variables’ may serve to prove a plaintiff's case.”)

. Especially at the third stage where all African-American interviewees were considered to be among the most qualified applicants.

. See Lex K. Larson, Employment Discrimination § 8.01[1] (2d ed. 2004) ("Employers are, on the whole, too sophisticated to profess their prejudices on paper or before witnesses. The Supreme Court in McDonnell Douglas, recognizing the necessity in most instances of reliance on circumstantial evidence, laid down rules of proof under which direct evidence of discriminatoiy intent is not necessary to the making of a prima facie case.”).