**Sharon M. WOOTEN, Plaintiff,**

v.

**BOARD OF TRUSTEES, FLORIDA A & M UNIVERSITY, et al., Defendants.**

**No. 4:04CV177–RH/WCS.**

United States District Court, N.D. Florida, Tallahassee Division.

Jan. 10, 2006.

Marie A. Mattox, Marie A. Mattox PA, Tallahassee, FL, for Plaintiff.

Diana K. Shumans, Moyle Flanigan Katz etc, Robert Jacob Sniffen, Sniffen Law Firm PA, Tallahassee, FL, for Defendants.

### ORDER GRANTING SUMMARY JUDGMENT

HINKLE, Chief Judge.

This is an employment discrimination case. Plaintiff Sharon M. Wooten, a white professor at historically black Florida A & M University, asserts that she has suffered racial discrimination in pay and that she has been mistreated in other respects based both on her race and in retaliation for having complained of racial discrimination. She seeks redress under Title VII of the Civil Rights Act of 1964, as amended, and under the analogous provisions of the Florida Civil Rights Act. The defendant Board of Trustees of Florida A & M University has moved for summary judgment. I grant the motion, concluding that (1) Dr. Wooten has presented no evidence of racial discrimination in pay, and (2) the other matters about which Dr. Wooten complains either (a) have not been shown to be related to race or retaliation and/or (b) do not meet the required threshold level of substantiality.

#### Background

Dr. Wooten accepted employment at Florida A & M as a professor in 1984.

Her supervisor was Dr. Eva C. Wanton, Dean of the School of General Studies. In 1985 Dr. Wanton promoted Dr. Wooten to Director of the Learning Development and Evaluation Center ("LDEC"), a program that assisted students with learning disabilities. All apparently was well for more than a decade.

In 1998, Dr. Wanton was promoted, and Dr. Barbara Barnes succeeded her as Dean of the School of General Studies (and thus as Dr. Wooten's supervisor). Dr. Wooten asserts she was mistreated by Dr. Barnes in various respects. For example, Dr. Wooten says Dr. Barnes did not allow Dr. Wooten to take leave when her son was hospitalized and did not allow Dr. Wooten to have her secretary pick up her mail. During the same period, students and parents began to make complaints about Dr. Wooten. In December 1998 Dr. Wooten filed an internal complaint alleging racial discrimination. Apparently in response, University President Dr. Frederick Humphries offered to move the LDEC (and thus Dr. Wooten) out of the School of General Studies and back under the supervision of Dr. Wanton; this was acceptable to Dr. Wooten. Based on that action and at Dr. Humphries' request, Dr. Wooten dropped her discrimination complaint.

In 2001 Dr. Humphries gave Dr. Wooten a raise of more than $12,000 annually, apparently in response to Dr. Wooten's request and assertion that she was underpaid.

In 2002 an anonymous complaint to the State of Florida employee hotline accused Dr. Wooten of various improper personnel and management practices. The complaint was referred to the university's Office of Inspector General, which conducted an investigation. It apparently became evident to Dr. Wooten that the investigation would not be resolved favorably. On January 16, 2003, Dr. Wooten dual filed a charge of racial discrimination with the Florida Commission on Human Relations and the federal Equal Employment Opportunity Commission. On January 17, 2003, the Office of Inspector General issued its report. The report, which Dr. Wooten lambasts as inaccurate in many respects, criticized Dr. Wooten's hiring and management practices. Among other things, the report criticized Dr. Wooten's hiring of Charles Whatley, who had no training or experience in special education and had been convicted of indecent exposure. The report recommended that any further hiring or promotion decisions by Dr. Wooten be subject to approval of higher authorities. No disciplinary action against Dr. Wooten was recommended or imposed.

In the summer of 2003 the LDEC was moved back into the School of General Studies, where Dr. Dorothy Henderson had become dean. Dr. Wooten attempted without success to fill several positions that had been funded by the Florida Legislature. Dr. Henderson, whose approval was required, found Dr. Wooten's proposed hires unqualified. The positions remained (and still remain) open. This has markedly increased the workload of Dr. Wooten and other LDEC employees.

Dr. Wooten attributes her inability to fill the positions to racial discrimination or retaliation. She says her pay remains depressed because of her race notwithstanding the 2001 raise. She also asserts she has suffered a number of other indignities based on racial discrimination or retaliation. Examples include the following. Dr. Wooten was denied reimbursement for over $400 in travel expenses incurred to return to her alma mater to accept an award. A parent called her a cracker from Alabama, and administrators did not come to her defense. When Dr. Wooten wore what she describes as traditional African American dress as a recognition of black history month, Avery McKnight, a

university attorney, said she looked like she belonged in a theater. Annette Oliver, an employee under Dr. Wooten's supervision, accused Dr. Wooten of racial discrimination. Several students filed similarly-worded complaints of racial discrimination against Dr. Wooten that Dr. Wooten believed were orchestrated by Ms. Oliver. Newly appointed interim President Castell Bryant denied Dr. Wooten's request for a six-month paid sabbatical. In the summer of 2005 Dr. Wooten was asked to sign a three-month contract, rather than a 12–month contract as she had signed in prior years, and an investigation of her use of sick leave was initiated. Dr. Wooten says she is "waiting for the 'ax to fall.'" (Document 66 at 8.)

Nonetheless, Dr. Wooten remains in her position as the Director of the LDEC and as a tenured professor. She has been subjected to no disciplinary action of any kind.

## Merits

### I. Disparate Pay

■ Dr. Wooten's first claim is that she has suffered racial discrimination in pay. It is of course a violation of Title VII to pay a person less because of her race. The issue here is one of fact: during the relevant period (that is, the period from January 16, 2002, to the present [1]) has Dr. Wooten been paid less because she is white than she would have been paid had she been African American. The burden of proof on this issue of course is on Dr. Wooten.

This record includes not one word of support for Dr. Wooten's claim.

First, this record includes no direct evidence that Dr. Wooten's pay has been affected by race. *See, e.g., Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir.2004) (defining direct evidence of discrimination). So far as this record reflects, nobody involved in setting Dr. Wooten's salary—and for that matter nobody affiliated with Florida A & M at all, other than Dr. Wooten herself—has ever said or suggested in any way that race has affected Dr. Wooten's salary. It is true, as Dr. Wooten emphasizes, that Dr. Humphries gave her a $12,000 raise in 2001, but that hardly qualifies as an admission that she had suffered racial discrimination. More importantly, the 2001 raise provides no support for the claim that her salary was *still* being affected by race in 2002 and thereafter.

Second, this record includes no statistical or pattern and practice evidence of racial discrimination in pay at Florida A & M generally or with respect to Dr. Wooten specifically.

Third, a Title VII plaintiff may of course invoke the familiar burden-shifting frame-

1. Dr. Wooten filed her charge of discrimination with the FCHR and EEOC on January 16, 2003, thus perfecting state- and federal-law claims of discrimination for the periods beginning 365 and 300 days earlier, respectively. The earliest date for which a claim was perfected thus was January 16, 2002. Florida A & M asserts that Dr. Wooten's pay claim is time barred because it was not asserted within 365 days after Dr. Humphries set her salary in 2001 (her salary has since been adjusted only by routine cost of living raises). But that assertion is plainly wrong. Every racially discriminatory paycheck is a violation of the Florida Civil Rights Act and Title VII that can be remedied if an administrative charge is filed within 365 (or 300) days thereafter. *See, e.g., Bazemore v. Friday*, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986). That this is not a "continuing" violation, *see National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), means only that an employee cannot reach back more than 365 (or 300) days prior to the filing of an administrative charge; it does not mean, as Florida A & M apparently asserts, that if an employer gets away with racial discrimination in pay for 365 days, the employer is in the clear and can continue to discriminate forever, without fear of redress.

work set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that framework, the plaintiff has the initial burden of establishing a prima facie case. One of the elements of a prima facie case in this context is that persons outside plaintiff's protected class were treated more favorably in comparable circumstances. *See, e.g., Cuddeback v. Florida Bd. of Educ.*, 381 F.3d 1230, 1235–36 (11th Cir.2004); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir.1984). In applying this test, the comparator must be "similarly situated 'in all relevant respects.'" *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir.2004) (quoting earlier Eleventh Circuit authorities).

In the case at bar, Dr. Wooten rests her claim on a single comparator: Dr. Adeline Evans. But Dr. Wooten and Dr. Evans are not "similarly situated in all relevant respects." Most fundamentally, Dr. Evans and Dr. Wooten have very different jobs; Dr. Evans is a full-time classroom teaching professor in the English Department, while Dr. Wooten runs the LDEC and does limited classroom teaching. In her affidavit submitted in response to the pending motion for summary judgment, Dr. Wooten confirmed this, commenting on her own deposition testimony as follows: "I was asked to identify specific employees comparable to me in all respects and I responded that there are none." (Wooten Aff. at 28 ¶ 44.) Dr. Wooten continued:

> The nature of students served by the LDEC makes staff responsibilities for LDEC staff totally different from all other programs at the University.... No other staff on the University campus has the same unique responsibility as LDEC staff....
>
> .... There is *not* another program on campus *comparable* to the LDEC *nor* is there another person on campus with

*comparable* duties. At most, there are some *vague similarities*, but *no comparators*.

*Id.*, at 28–29, ¶¶ 45–46 (emphasis in original). This testimony, standing alone, would be sufficient to defeat Dr. Wooten's attempt to invoke the *McDonnell Douglas* methodology. In addition, Dr. Evans has been at Florida A & M more than a decade longer than Dr. Wooten, Dr. Evans previously served in the administration (receiving a raise that has carried forward), and Dr. Evans has received merit-based raises for excellence in teaching. A reasonable administrator might choose to pay an English professor (particularly one with this background) more than an LDEC director, or might not. But one would not expect two people performing these different jobs with these different histories to be paid the same, and reasonable people might differ on who should be paid more. Dr. Evans is not a comparator within the *McDonnell Douglas* framework.

Finally, Dr. Wooten argues that a discrimination claim can be based on "other evidence," even when there is no direct evidence, no statistical or pattern and practice evidence, and no comparator as required for a *McDonnell Douglas* prima facie case. Although there are authorities one could cite to the contrary, I assume for present purposes that Dr. Wooten is correct. Thus if the trier-of-fact could draw a reasonable inference from all the relevant evidence that an employer made a challenged decision based on race, then the employee could prevail even if that evidence did not comport with one of the well defined and traditional modes of proof. But here Dr. Wooten has presented no such evidence. None of the actions about which Dr. Wooten complains provide the slightest support for a claim of discrimination in pay.

Summary judgment will be entered on the disparate pay claim.

## II. Other Actions with Financial Impacts

Dr. Wooten also alleges she has suffered other deprivations based on race or in retaliation for having complained of racial discrimination. Two had financial consequences.

■ First, Dr. Wooten was denied reimbursement for expenses incurred to travel to her alma mater to receive an award. Dr. Wooten has presented no evidence, however, that the reimbursement decision had anything to do with race or retaliation, and no evidence that any other professor was reimbursed under similar circumstances. As with her pay claim, therefore, Dr. Wooten has failed to establish a travel reimbursement claim by direct evidence, using the *McDonnell Douglas* framework, or otherwise.

■ Second, Dr. Bryant refused Dr. Wooten's recent request for a six-month paid sabbatical. Again, however, Dr. Wooten has proffered no direct evidence that the decision had anything to do with race or retaliation, and Dr. Wooten has identified no comparator who was treated more favorably under similar circumstances. Dr. Wooten's claim that *she* was given a sabbatical in 1992 hardly supports a claim of racial discrimination or retaliation; a more plausible explanation is that times and sabbatical policies change, as do a

university's financial circumstances.[2] Dr. Bryant, who denied Dr. Wooten's most recent sabbatical request, was not the decision maker ten years ago.

In sum, Dr. Wooten has presented no evidence that would support a finding that the travel reimbursement and sabbatical decisions had anything to do with race or retaliation, and Dr. Wooten has failed to make out a *McDonnell Douglas* prima facie case on these issues.

## III. Nonfinancial Matters

■ Dr. Wooten also complains of her treatment in respects unrelated to money. It is clear that Title VII prohibits racial discrimination and retaliation in nonfinancial as well as financial aspects of employment.[3] But in order to prevail on such a claim, an employee must show that he or she suffered race- or retaliation-based effects that rise to a required threshold level of substantiality. Dr. Wooten's nonfinancial claims founder on this requirement.

The many opinions addressing this issue in this circuit and elsewhere have not always used the same language to describe the required level of substantiality. But the principles that emerge from the opinions are, at least to the extent necessary for resolution of the case at bar, clear and consistent.

■ First, it is clear that Title VII prohibits both discrimination based on prohibited characteristics such as race, on the one hand,[4] and retaliation for having op-

---

2. Though I would make the same decision even if it were not so, I note that, as Dr. Wooten has acknowledged, Dr. Bryant came to Florida A & M as interim president with a mandate to right Florida A & M's listing economic ship. That she denied a request for six months paid leave is hardly surprising.

3. The same is true of the Florida Civil Rights Act. For convenience, this section of this opinion discusses Title VII. The same analysis applies under the Florida Civil Rights Act.

4. The statute makes it an "unlawful employment practice" to "fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1).

posed or participated in an investigation of such discrimination, on the other hand.[5] For convenience, I refer in this order to claims asserting discrimination based on prohibited characteristics as race claims, without referring to the other (equally important) prohibited characteristics.

■ Second, it also is clear that the requirement that a plaintiff meet a threshold level of substantiality applies both to race claims and to retaliation claims. Whether the threshold is the *same* for both categories of claims may be less clear, but the better view is that it *is* the same.[6] Indeed, the Eleventh Circuit has repeatedly cited interchangeably its various decisions dealing with the required level of substantiality in race cases, on the one hand, and retaliation cases, on the other.[7] More importantly, there is an enormous practical benefit to treating the standard

as identical for both types of claims, which often are tried together to a single jury.[8] Neither side in the case at bar has taken issue with the proposition that the required level of substantiality is the same in race claims and retaliation claims.

Courts have used various terms in discussing the required level of substantiality. Thus, for example, courts have referred to "tangible" effects, always including within that term the loss of money as well as other direct financial impacts, and always making clear that such tangible effects are not the only effects covered by Title VII. Courts have referred to "adverse employment action," sometimes (but not always) as a synonym for any action that rises to the required level of substantiality. Courts also have referred to a "hostile work environment" or "abusive work environment," usually as a description of nonfi-

---

**5.** The statute prohibits discrimination against any employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

**6.** The statutory language is not identical. *See supra* notes 4 & 5. In particular, the ban on race discrimination refers to "terms, conditions, or privileges of employment," a phrase that is absent from the retaliation provision. The phrase has been highlighted in explaining that the statute goes beyond financial effects. *See, e.g., Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). But the retaliation provision also clearly goes beyond financial effects, and the purposes of both the race provision, on the one hand, and the retaliation provision, on the other, suggest no basis for treating them differently in this respect. Race discrimination and retaliation are equally reprehensible, each should be prohibited even in the absence of direct financial effects, but neither should be actionable when the only effects are so minor as not to warrant the invocation of Title VII.

**7.** *See, e.g., Mosley v. MeriStar Mgmt. Co.,* 137 Fed.Appx. 248, 252 (11th Cir.2005) (unpublished opinion) (in race case, citing retaliation case); *Cooley v. Great So. Wood Preserving,* 138 Fed.Appx. 149, 158 (11th Cir.2005) (unpublished opinion) (in retaliation case, citing race case); *Benefield v. Fulton Co.,* 130 Fed. Appx. 308, 313 (11th Cir.2005) (unpublished opinion) (in retaliation case, citing race case); *Wilbur v. Corr. Serv. Corp.,* 393 F.3d 1192, 1202 n. 5 (11th Cir.2004) (in sexual harassment case, citing retaliation case); *Shannon v. Bellsouth Telecommunications, Inc.,* 292 F.3d 712, 716 (11th Cir.2002) (in retaliation case, citing race case); *Davis v. Town of Lake Park,* 245 F.3d 1232, 1238–39 (11th Cir.2001) (in race case, citing retaliation cases); *Johnson v. Booker T. Washington Broad. Serv., Inc.,* 234 F.3d 501, 509 (11th Cir.2000) (in sexual harassment case, citing retaliation case).

**8.** A retaliation claim is often tried together with the underlying race claim, as would have occurred in the case at bar. Instructing the same jury on one required level of substantiality for a race claim and a different required level of substantiality for a retaliation claim would impose a level of complexity and confusion that would serve the interests of nobody. For those of us who labor to conduct fair trials, this would be a nightmare.

nancial effects that reach the required level of substantiality.

The Supreme Court has repeatedly made clear that requiring a person to work in a hostile or abusive environment because of race or gender is actionable. Thus, for example, in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Court said that an employee who is subjected to a "severe or pervasive" hostile or abusive environment because of race or gender may recover under Title VII even without showing actual psychological harm. Although *Harris* was a sexual harassment case, the Court relied on the language of the statute prohibiting race or gender discrimination generally,[9] and the Court cited cases dealing not only with sexual harassment but with other forms of gender[10] and national origin[11] discrimination. The Court's holding that an environment that is sufficiently "severe or pervasive" is actionable plainly applies not only to sexual harassment claims but also to other types of discrimination prohibited by Title VII. And because the required level of substantiality is the same for race or gender claims, on the one hand, and retaliation claims, on the other hand, subjecting an employee to a hostile or abusive environment in retaliation is actionable, just as is subjecting an employee to a hostile or abusive environment based on race. Neither side has taken issue with this proposition in the case at bar.[12]

None of these terms—tangible effects, adverse employment action, hostile or abusive work environment—are terms that have inherent meaning separate and apart from their use in Title VII cases. By whatever name known, there is a required threshold level of substantiality that a Title VII plaintiff must meet. When the effects are nonfinancial, the requirement is for race- or retaliation-based conditions that, considered in their entirety, are "severe or pervasive." Dr. Wooten's allegations do not come close.

Dr. Wooten received a three-month contract rather than a 12-month contract, but she is tenured; how often she must sign a contract is trivial, and nothing about this bears any apparent relationship to race or retaliation.

■ An anonymous call to the state's whistle blower hotline led to an investigation that concluded Dr. Wooten's hiring practices needed improvement.[13] This led

9. *See Harris*, 510 U.S. at 21, 114 S.Ct. 367, quoting 42 U.S.C. § 2000e–2(a)(1).

10. *See Harris*, 510 U.S. at 21, 114 S.Ct. 367, quoting *Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 707 n. 13, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978).

11. *See Harris*, 510 U.S. at 22, 114 S.Ct. 367, quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971).

12. None of the authorities in this area draws a bright line. Indeed, the Eleventh Circuit has explicitly chosen not to draw such a line:
Although we do not doubt that there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable under the anti-retaliation clause, we need not determine in this case the exact notch into which the bar should be placed. It is enough to conclude, as we do, that the actions about which Wideman complains considered collectively are sufficient to constitute prohibited discrimination. We need not and do not decide whether anything less than the totality of the alleged reprisals would be sufficient. *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.1998).

13. The conclusion, stridently criticized by Dr. Wooten, was not without support. Thus, for example, Dr. Wooten hired Mr. Whatley, who had no specialized training or experience in special education and had been convicted of indecent exposure. Dr. Wooten says no university policy required a background check. But neither did any university policy *prohibit* a background check. One might reasonably expect the director of a program for learning disabled students to check the backgrounds of applicants sufficiently to exclude those with

to a requirement that Dr. Wooten receive the approval of her supervisor, Dr. Henderson, before making new hires. Positions have remained unfilled (increasing the workload of Dr. Wooten and others) because Dr. Henderson has found unqualified the prospects Dr. Wooten has sought to hire. There is no evidence that any of this—the report, the requirement that new hires be approved, or the failure to approve nominees for these positions—was related to race or retaliation. And none of this rises to the level of "severe or pervasive" conditions that are actionable under Title VII.

Dr. Wanton told Dr. Wooten she could not have a "lily white" department, even though the LDEC had a diverse workforce. A parent called Dr. Wooten a cracker from Alabama, a remark suggesting racial animus on the part of the parent, and university officials offered no rebuttal. Ms. Oliver, who worked for Dr. Wooten, accused Dr. Wooten of racial discrimination. Several students complained of racial discrimination by Dr. Wooten, perhaps at the instance of Ms. Oliver. Mr. McKnight, a University attorney, said Dr. Wooten, who was wearing dress she deemed an appropriate recognition of black history month, looked like she belonged in a theater. These events, considered collectively and together with all the other circumstances shown by this record, were not "severe or pervasive," and do not rise to the required threshold level of substantiality.[14]

### Conclusion

It is commonplace in employment discrimination opinions to note that federal courts do not sit as super-personnel boards. The principle is fully applicable here. Dr. Wooten has proffered no evidence that she has suffered racial discrimination in pay or other financial matters. Though she complains of the environment in which she has worked, this record includes no evidence that any effects related to race or retaliation have been "severe or pervasive." For these reasons,

IT IS ORDERED:

Defendant's motion for summary judgment (document 49) is GRANTED. The clerk shall enter judgment stating, "This action is dismissed with prejudice." The clerk shall close the file.

---

convictions of this type, at least absent an explanation. Mr. Whatley's employment ended, though not at Dr. Wooten's election, soon after the conviction came to light.

**14.** This conclusion makes it unnecessary to address the affirmative defense asserted under *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).