Justice Ginsburg,
with whom
Justice Stevens, Justice Souter, and Justice Breyer join, dissenting.
Lilly Ledbetter was a supervisor at Goodyear Tire & Rubber’s plant in Gadsden, Alabama, from 1979 until her retirement in 1998. For most of those years, she worked as an area manager, a position largely occupied by men. Initially, Ledbetter’s salary was in line with the salaries of men performing substantially similar work. Over time, however, her pay slipped in comparison to the pay of male area managers with equal or less seniority. By the end of 1997, Ledbetter was the only woman working as an area manager and the pay discrepancy between Ledbetter and her 15 male counterparts was stark: Ledbetter was paid $3,727 per month; the lowest paid male area manager received $4,286 per month, the highest paid, $5,236. See 421 F. 3d 1169, 1174 (CA11 2005); Brief for Petitioner 4.
Ledbetter launched charges of discrimination before the Equal Employment Opportunity Commission (EEOC) in March 1998. Her formal administrative complaint specified that, in violation of Title VII, Goodyear paid her a discrimi *644 natorily low salary because of her sex. See 42 U. S. C. § 2000e~2(a)(l) (rendering it unlawful for an employer “to discriminate against any individual with respect to [her] compensation . . . because of such individual’s . . . sex”). That charge was eventually tried to a jury, which found it “more likely than not that [Goodyear] paid [Ledbetter] a[n] unequal salary because of her sex.” App. 102. In accord with the jury’s liability determination, the District Court entered judgment for Ledbetter for backpay and damages, plus counsel fees and costs.
The Court of Appeals for the Eleventh Circuit reversed. Relying on Goodyear’s system of annual merit-based raises, the court held that Ledbetter’s claim, in relevant part, was time barred. 421 F. 3d, at 1171, 1182-1183. Title VII provides that a charge of discrimination “shall be filed within [180] days after the alleged unlawful employment practice occurred.” 42 U. S. C. §20Q0e-5(e)(l).[1] Ledbetter charged, and proved at trial, that within the 180-day period, her pay was substantially less than the pay of men doing the same work. Further, she introduced evidence sufficient to establish that discrimination against female managers at the Gadsden plant, not performance inadequacies on her part, accounted for the pay differential. See, e. g., App. 36-47, 51-68, 82-87, 90-98, 112-113. That evidence was unavailing, the Eleventh Circuit held, and the Court today agrees, because it was incumbent on Ledbetter to file charges year by year, each time Goodyear failed to increase her salary commensurate with the salaries of male peers. Any annual pay decision not contested immediately (within 180 days), the Court affirms, becomes grandfathered, a fait accompli beyond the province of Title VII ever to repair.
*645 The Court’s insistence on immediate contest overlooks common characteristics of pay discrimination. Pay disparities often occur, as they did in Ledbetter’s case, in small increments; cause to suspect that discrimination is at work develops only over time. Comparative pay information, moreover, is often hidden from the employee’s view. Employers may keep under wraps the pay differentials maintained among supervisors, no less the reasons for those differentials. Small initial discrepancies may not be seen as meet for a federal case, particularly when the employee, trying to succeed in a nontraditional environment, is averse to making waves.
Pay disparities are thus significantly different from adverse actions “such as termination, failure to promote,... or refusal to hire,” all involving fully communicated discrete acts, “easy to identify” as discriminatory. See National Railroad Passenger Corporation v. Morgan, 536 U. S. 101, 114 (2002). It is only when the disparity becomes apparent and sizable, e. g., through future raises calculated as a percentage of current salaries, that an employee in Ledbetter’s situation is likely to comprehend her plight and, therefore, to complain. Her initial readiness to give her employer the benefit of the doubt should not preclude her from later challenging the then current and continuing payment of a wage depressed on account of her sex.
On questions of time under Title VII, we have identified as the critical inquiries: “What constitutes an ‘unlawful employment practice’ and when has that practice ‘occurred’?” Id., at 110. Our precedent suggests, and lower courts have overwhelmingly held, that the unlawful practice is the current payment of salaries infected by gender-based (or race-based) discrimination — a practice that occurs whenever a paycheck delivers less to a woman than to a similarly situated man. See Bazemore v. Friday, 478 U. S. 385, 395 (1986) (Brennan, J., joined by all other Members of the Court, concurring in part).
*646 I
Title VII proscribes as an “unlawful employment practice” discrimination “against any individual with respect to his compensation... because of such individual’s race, color, religion, sex, or national origin.” 42 U. S. C. §2000e-2(a)(l). An individual seeking to challenge an employment practice under this proscription must file a charge with the EEOC within 180 days “after the alleged unlawful employment practice occurred.” § 2000e-5(e)(1). See ante, at 624; supra, at 644, n. 1.
Ledbetter’s petition presents a question important to the sound application of Title VII: What activity qualifies as an unlawful employment practice in cases of discrimination with respect to compensation. One answer identifies the pay-setting decision, and that decision alone, as the unlawful practice. Under this view, each particular salary-setting decision is discrete from prior and subsequent decisions, and must be challenged within 180 days on pain of forfeiture. Another response counts both the pay-setting decision and the actual payment of a discriminatory wage as unlawful practices. Under this approach, each payment of a wage or salary infected by sex-based discrimination constitutes an unlawful employment practice; prior decisions, outside the 180-day charge-filing period, are not themselves actionable, but they are relevant in determining the lawfulness of conduct within the period. The Court adopts the first view, see ante, at 621, 624, 628-629, but the second is more faithful to precedent, more in tune with the realities of the workplace, and more respectful of Title VII’s remedial purpose.
A
In Bazemore, we unanimously held that an employer, the North Carolina Agricultural Extension Service, committed an unlawful employment practice each time it paid black employees less than similarly situated white employees. 478 U. S., at 395 (opinion of Brennan, J.). Before 1965, the Ex *647 tension Service was divided into two branches: a white branch and a “Negro branch.” Id., at 390. Employees in the “Negro branch” were paid less than their white counterparts. In response to the Civil Rights Act of 1964, which included Title VII, the State merged the two branches into a single organization, made adjustments to reduce the salary disparity, and began giving annual raises based on nondiseriminatory factors. Id., at 390-391, 394-395. Nonetheless, “some pre-existing salary disparities continued to linger on.” Id., at 394 (internal quotation marks omitted). We rejected the Court of Appeals’ conclusion that the plaintiffs could not prevail because the lingering disparities were simply a continuing effect of a decision lawfully made prior to the effective date of Title VII. See id., at 395-396. Rather, we reasoned, “[e]ach week’s paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII.” Id., at 395. Paychecks perpetuating past discrimination, we thus recognized, are actionable not simply because they are “related” to a decision made outside the charge-filing period, cf. ante, at 636, but because they discriminate anew each time they issue, see Bazemore, 478 U. S., at 395-396, and n. 6; Morgan, 536 U. S., at 111-112.
Subsequently, in Morgan, we set apart, for purposes of Title VII’s timely filing requirement, unlawful employment actions of two kinds: “discrete acts” that are “easy to identify” as discriminatory, and acts that recur and are cumulative in impact. See id., at 110, 113-115. “[A] [discrete ae[t] such as termination, failure to promote, denial of transfer, or refusal to hire,” id., at 114, we explained, “ ‘occur[s]’ on the day that it ‘happen[s].’ A party, therefore, must file a charge within . . . 180 . . . days of the date of the act or lose the ability to recover for it.” Id., at 110; see id., at 113 (“[Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act.”).
*648 “[Different in kind from discrete acts,” we made clear, are “claims . . . based on the cumulative effect of individual acts.” Id., at 115. The Morgan decision placed hostile work environment claims in that category. “Their very nature involves repeated conduct.” Ibid. “The unlawful employment practice” in hostile work environment claims “cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.” Ibid, (internal quotation marks omitted). The persistence of the discriminatory conduct both indicates that management should have known of its existence and produces a cognizable harm. Ibid. Because the very nature of the hostile work environment claim involves repeated conduct,
“[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.” Id., at 117.
Consequently, although the unlawful conduct began in the past, “a charge may be filed at a later date and still encompass the whole.” Ibid.
Pay disparities, of the kind Ledbetter experienced, have a closer kinship to hostile work environment claims than to charges of a single episode of discrimination. Ledbetter’s claim, resembling Morgan’s, rested not on one particular paycheck, but on “the cumulative effect of individual acts.” See id., at 115. See also Brief for Petitioner 13, 15-17, and n. 9 (analogizing Ledbetter’s claim to the recurring and cumulative harm at issue in Morgan); Reply Brief for Petitioner 13 (distinguishing pay discrimination from “easy to identify” discrete acts (internal quotation marks omitted)). *649 She charged insidious discrimination building up slowly but steadily. See Brief for Petitioner 5-8. Initially in line with the salaries of men performing substantially the same work, Ledbetter’s salary fell 15 to 40 percent behind her male counterparts only after successive evaluations and percentage-based pay adjustments. See supra, at 643-644. Over time, she alleged and proved, the repetition of pay decisions undervaluing her work gave rise to the current discrimination of which she complained. Though component acts fell outside the charge-filing period, with each new paycheck, Goodyear contributed incrementally to the accumulating harm. See Morgan, 536 U. S., at 117; Bazemore, 478 U. S., at 395-396; cf. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U. S. 481, 502, n. 15 (1968).[2]
B
The realities of the workplace reveal why the discrimination with respect to compensation that Ledbetter suffered does not fit within the category of singular discrete acts “easy to identify.” A worker knows immediately if she is denied a promotion or transfer, if she is fired or refused employment. And promotions, transfers, hirings, and firings are generally public events, known to co-workers. When an employer makes a decision of such open and definitive character, an employee can immediately seek out an explanation and evaluate it for pretext. Compensation disparities, in contrast, are often hidden from sight. It is not unusual, decisions in point illustrate, for management to decline to pub *650 lish employee pay levels, or for employees to keep private their own salaries. See, e. g., Goodwin v. General Motors Corp., 275 F. 3d 1005, 1008-1009 (CA10 2002) (plaintiff did not know what her colleagues earned until a printout listing of salaries appeared on her desk, seven years after her starting salary was set lower than her co-workers’ salaries); McMillan v. Massachusetts Soc. for Prevention of Cruelty to Animals, 140 F. 3d 288, 296 (CA1 1998) (plaintiff worked for employer for years before learning of salary disparity published in a newspaper).[3] Tellingly, as the record in this case bears out, Goodyear kept salaries confidential; employees had only limited access to information regarding their colleagues’ earnings. App. 56-57, 89.
The problem of concealed pay discrimination is particularly acute where the disparity arises not because the female employee is flatly denied a raise but because male counterparts are given larger raises. Having received a pay increase, the female employee is unlikely to discern at once that she has experienced an adverse employment decision. She may have little reason even to suspect discrimination until a pattern develops incrementally and she ultimately becomes aware of the disparity. Even if an employee suspects that the reason for a comparatively low raise is not performance but sex (or another protected ground), the amount involved may seem too small, or the employer’s intent too ambiguous, to make the issue immediately actionable — or winnable.
Further separating pay claims from the discrete employment actions identified in Morgan, an employer gains from sex-based pay disparities in a way it does not from a discriminatory denial of promotion, hiring, or transfer. When a *651 male employee is selected over a female for a higher level position, someone still gets the promotion and is paid a higher salary; the employer is not enriched. But when a woman is paid less than a similarly situated man, the employer reduces its costs each time the pay differential is implemented. Furthermore, decisions on promotions, like decisions installing seniority systems, often implicate the interests of third-party employees in a way that pay differentials do not. Cf. Teamsters v. United States, 431 U. S. 324, 352-353 (1977) (recognizing that seniority systems involve “vested . . . rights of employees” and concluding that Title VII was not intended to “destroy or water down” those rights). Disparate pay, by contrast, can be remedied at any time solely at the expense of the employer who acts in a discriminatory fashion.
C
In light of the significant differences between pay disparities and discrete employment decisions of the type identified in Morgan, the cases on which the Court relies hold no sway. See ante, at 625-629 (discussing United Air Lines, Inc. v. Evans, 431 U. S. 553 (1977), Delaware State College v. Ricks, 449 U. S. 250 (1980), and Lorance v. AT&T Technologies, Inc., 490 U. S. 900 (1989)). Evans and Ricks both involved a single, immediately identifiable act of discrimination: in Evans, a constructive discharge, 431 U. S., at 554; in Ricks, a denial of tenure, 449 U. S., at 252. In each case, the employee filed charges well after the discrete discriminatory act occurred: When United Airlines forced Evans to resign because of its policy barring married female flight attendants, she filed no charge; only four years later, when Evans was rehired, did she allege that the airline’s former no-marriage rule was unlawful and therefore should not operate to deny her seniority credit for her prior service. See Evans, 431 U. S., at 554-557. Similarly, when Delaware State College denied Ricks tenure, he did not object until his terminal contract came to an end, one year later. Ricks, 449 U. S., at 253-254, 257-258. *652 No repetitive, cumulative discriminatory employment practice was at issue in either case. See Evans, 431 U. S., at 557-558; Ricks, 449 U. S., at 258.[4]
Lorance is also inapposite, for, in this Court’s view, it too involved a one-time discrete act: the adoption of a new seniority system that “had its genesis in sex discrimination.” See 490 U. S., at 902, 905 (internal quotation marks omitted). The Court’s extensive reliance on Lorance, ante, at 626-629, 633, 636-637, moreover, is perplexing for that decision is no longer effective: In the 1991 Civil Rights Act, Congress superseded Lorance’s holding. §112, 105 Stat. 1079 (codified as amended at 42 U. S. C. § 2000e-5(e)(2)). Repudiating our judgment that a facially neutral seniority system adopted with discriminatory intent must be challenged immediately, Congress provided:
“For purposes of this section, an unlawful employment practice occurs ... when the seniority system is adopted, when an individual becomes subject to the seniority system, or when a person aggrieved is injured by the application of the seniority system or provision of the system.” Ibid.
Congress thus agreed with the dissenters in Lorance that “the harsh reality of [that] decision” was “glaringly at odds with the purposes of Title VII.” 490 U. S., at 914 (opinion *653 of Marshall, J.). See also §3, 105 Stat. 1071 (1991 Civil Rights Act was designed “to respond to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination”).
True, § 112 of the 1991 Civil Rights Act directly addressed only seniority systems. See ante, at 627, and n. 2. But Congress made clear (1) its view that this Court had unduly contracted the scope of protection afforded by Title VII and other civil rights statutes, and (2) its aim to generalize the ruling in Bazemore. As the Senate Report accompanying the proposed Civil Rights Act of 1990, the precursor to the 1991 Act, explained:
“Where, as was alleged in Lorance, an employer adopts a rule or decision with an unlawful discriminatory motive, each application of that rule or decision is a new violation of the law. In Bazemore ..., for example,... the Supreme Court properly held that each application of th[e] racially motivated salary structure, i. e., each new paycheck, constituted a distinct violation of Title VII. Section 7(a)(2) generalizes the result correctly reached in Bazemore Civil Rights Act of 1990, S. Rep. No. 101-315, p. 54 (1990).[5]
See also 137 Cong. Rec. 29046, 29047 (1991) (Sponsors’ Interpretative Memorandum) (“This legislation should be interpreted as disapproving the extension of [Lorance] to contexts outside of seniority systems.”). But cf. ante, at 637 (relying on Lorance to conclude that “when an employer issues paychecks pursuant to a system that is facially nondiscriminatory and neutrally applied” a new Title VII violation does not occur (internal quotation marks omitted)).
Until today, in the more than 15 years since Congress amended Title VII, the Court had not once relied upon *654 Lorance. It is mistaken to do so now. Just as Congress' “goals in enacting Title VII . . . never included conferring absolute immunity on discriminatorily adopted seniority systems that survive their first [180] days,” 490 U. S., at 914 (Marshall, J., dissenting), Congress never intended to immunize forever discriminatory pay differentials unchallenged within 180 days of their adoption. This assessment gains weight when one comprehends that even a relatively minor pay disparity will expand exponentially over an employee’s working life if raises are set as a percentage of prior pay.
A clue to congressional intent can be found in Title VII’s backpay provision. The statute expressly provides that backpay may be awarded for a period of up to two years before the discrimination charge is filed. 42 U. S. C. §2000e-5(g)(l) (“Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission.”). This prescription indicates that Congress contemplated challenges to pay discrimination commencing before, but continuing into, the 180-day filing period. See Morgan, 536 U. S., at 119 (“If Congress intended to limit liability to conduct occurring in the period within which the party must file the charge, it seems unlikely that Congress would have allowed recovery for two years of back-pay.”). As we recognized in Morgan, “the fact that Congress expressly limited the amount of recoverable damages elsewhere to a particular time period [i. e., two years] indicates that the [180-day] timely filing provision was not meant to serve as a specific limitation ... [on] the conduct that may be considered.” Ibid.
D
In tune with the realities of wage discrimination, the Courts of Appeals have overwhelmingly judged as a present violation the payment of wages infected by discrimination: Each paycheck less than the amount payable had the employer adhered to a nondiscriminatory compensation regime, courts have held, constitutes a cognizable harm. See, e. g., *655 Forsyth v. Federation Employment and Guidance Serv., 409 F. 3d 565, 573 (CA2 2005) (“Any paycheck given within the [charge-filing] period . . . would be actionable, even if based on a discriminatory pay scale set up outside of the statutory period.”); Shea v. Rice, 409 F. 3d 448, 452-453 (CADC 2005) (“[An] employer eommit[s] a separate unlawful employment practice each time he pa[ys] one employee less than another for a discriminatory reason” (citing Bazemore, 478 U. S., at 396)); Goodwin, 275 F. 3d, at 1009-1010 (“[Bazemore] has taught a crucial distinction with respect to discriminatory disparities in pay, establishing that a discriminatory salary is not merely a lingering effect of past discrimination — instead it is itself a continually recurring violation.... [E]ach race-based discriminatory salary payment constitutes a fresh violation of Title VII.” (footnote omitted)); Anderson v. Zubieta, 180 F. 3d 329, 335 (CADC 1999) (“The Courts of Appeals have repeatedly reached the . . . conclusion” that pay discrimination is “actionable upon receipt of each paycheck.”); accord Hildebrandt v. Illinois Dept. of Natural Resources, 347 F. 3d 1014, 1025-1029 (CA7 2003); Cardenas v. Massey, 269 F. 3d 251, 257 (CA3 2001); Ashley v. Boyle’s Famous Corned Beef Co., 66 F. 3d 164, 167-168 (CA8 1995) (en banc); Brinkley-Obu v. Hughes Training, Inc., 36 F. 3d 336, 347-349 (CA4 1994); Gibbs v. Pierce Cty. Law Enforcement Support Agcy., 785 F. 2d 1396, 1399-1400 (CA9 1986).
Similarly in line with the real-world characteristics of pay discrimination, the EEOC — the federal agency responsible for enforcing Title VII, see, e. g., 42 U. S. C. §§ 2Q00e-5(f), 2000e-12(a) — has interpreted the Act to permit employees to challenge disparate pay each time it is received. The EEOC’s Compliance Manual provides that “[Repeated occurrences of the same discriminatory employment action, such as discriminatory paychecks, can be challenged as long as one discriminatory act occurred within the charge filing period.” 2 EEOC Compliance Manual §2-IV-C(1)(a), p. 605:0024, and n. 183 (2006); cf. id., §10-111, p. 633:0002 *656 (Title VII requires an employer to eliminate pay disparities attributable to a discriminatory system, even if that system has been discontinued).
The EEOC has given effect to its interpretation in a series of administrative decisions. See Albritton v. Potter, No. 01A44063, 2004 WL 2983682, *2 (EEOC Office of Fed. Operations, Dec. 17, 2004) (although disparity arose and employee became aware of the disparity outside the charge-filing period, claim was not time barred because “[e]ach paycheck that complainant receives which is less than that of similarly situated employees outside of her protected classes could support a claim under Title VII if discrimination is found to be the reason for the pay discrepancy.” (citing Bazemore, 478 U. S., at 396)). See also Bynum-Doles v. Winter, No. 01A53973, 2006 WL 2096290 (EEOC Office of Fed. Operations, July 18, 2006); Ward v. Potter, No. 01A60047, 2006 WL 721992 (EEOC Office of Fed. Operations, Mar. 10, 2006). And in this very case, the EEOC urged the Eleventh Circuit to recognize that Ledbetter’s failure to challenge any particular pay-setting decision when that decision was made “does not deprive her of the right to seek relief for discriminatory paychecks she received in 1997 and 1998.” Brief of EEOC in Support of Petition for Rehearing and Suggestion for Rehearing En Banc, in No. 03-15264-GG (CA11), p. 14 (hereinafter EEOC Brief) (citing Morgan, 536 U. S., at 113).[6]
*657 II
The Court asserts that treating pay discrimination as a discrete act, limited to each particular pay-setting decision, is necessary to “protecft] employers from the burden of defending claims arising from employment decisions that are long past.” Ante, at 630 (quoting Ricks, 449 U. S., at 256-257). But the discrimination of which Ledbetter complained is not long past. As she alleged, and as the jury found, Goodyear continued to treat Ledbetter differently because of sex each pay period, with mounting harm. Allowing employees to challenge discrimination “that extendjsj over long periods of time,” into the charge-filing period, we have previously explained, “does not leave employers defenseless” against unreasonable or prejudicial delay. Morgan, 536 U. S., at 121. Employers disadvantaged by such delay may raise various defenses. Id., at 122. Doctrines such as “waiver, estoppel, and equitable tolling” “allow us to honor Title VII’s remedial purpose without negating the particular purpose of the filing requirement, to give prompt notice to the employer.” Id., at 121 (quoting Zipes v. Trans World Airlines, Inc., 455 U. S. 385, 398 (1982)); see 536 U. S., at 121 (defense of laches may be invoked to block an employee’s suit “if he unreasonably delays in filing [charges] and as a result harms the defendant”); EEOC Brief 15 (“[I]f Ledbetter unreasonably delayed challenging an earlier decision, and that delay significantly impaired Goodyear’s ability to defend itself . . . Goodyear can raise a defense of laches.. . . ”).[7]
In a last-ditch argument, the Court asserts that this dissent would allow a plaintiff to sue on a single decision made *658 20 years ago “even if the employee had full knowledge of all the circumstances relating to the . .. decision at the time it was made.” Ante, at 639. It suffices to point out that the defenses just noted would make such a suit foolhardy. No sensible judge would tolerate such inexcusable neglect. See Morgan, 536 U. S., at 121 (“In such cases, the federal courts have the discretionary power ... to locate a just result in light of the circumstances peculiar to the case.” (internal quotation marks omitted)).
Ledbetter, the Court observes, ante, at 640-641, n. 9, dropped an alternative remedy she could have pursued: Had she persisted in pressing her claim under the Equal Pay Act of 1963 (EPA), 29 U. S. C. § 206(d), she would not have encountered a time bar.[8] See ante, at 640 (“If Ledbetter had pursued her EPA claim, she would not face the Title VII obstacles that she now confronts.”); cf. Corning Glass Works v. Brennan, 417 U. S. 188, 208-210 (1974). Notably, the EPA provides no relief when the pay discrimination charged is based on race, religion, national origin, age, or disability. Thus, in truncating the Title VII rule this Court announced in Bazemore, the Court does not disarm female workers from achieving redress for unequal pay, but it does impede racial and other minorities from gaining similar relief.[9]
*659 Furthermore, the difference between the EPA’s prohibition against paying unequal wages and Title VIPs ban on discrimination with regard to compensation is not as large as the Court’s opinion might suggest. See ante, at 640. The key distinction is that Title VII requires a showing of intent. In practical effect, “if the trier of fact is in equipoise about whether the wage differential is motivated by gender discrimination,” Title VII compels a verdict for the employer, while the EPA compels a verdict for the plaintiff. 2 C. Sullivan, M. Zimmer, & R. White, Employment Discrimination: Law and Practice §7.08[F][3], p. 532 (3d ed. 2002). In this case, Ledbetter carried the burden of persuading the jury that the pay disparity she suffered was attributable to intentional sex discrimination. See supra, at 643-644; infra this page and 660.
Ill
To show how far the Court has strayed from interpretation of Title VII with fidelity to the Act’s core purpose, I return to the evidence Ledbetter presented at trial. Ledbetter proved to the jury the following: She was a member of a protected class; she performed work substantially equal to work of the dominant class (men); she was compensated less for that work; and the disparity was attributable to gender-based discrimination. See supra, at 643-644.
Specifically, Ledbetter’s evidence demonstrated that her current pay was discriminatorily low due to a long series of decisions reflecting Goodyear’s pervasive discrimination against women managers in general and Ledbetter in particular. Ledbetter’s former supervisor, for example, admitted to the jury that Ledbetter’s pay, during a particular one-year period, fell below Goodyear’s minimum threshold for her position. App. 93-97. Although Goodyear claimed the pay disparity was due to poor performance, the supervisor acknowledged that Ledbetter received a “Top Performance Award” in 1996. Id., at 90-93. The jury also heard testimony that another supervisor — who evaluated Ledbetter in *660 1997 and whose evaluation led to her most recent raise denial — was openly biased against women. Id., at 46, 77-82. And two women who had previously worked as managers at the plant told the jury they had been subject to pervasive discrimination and were paid less than their male counterparts. One was paid less than the men she supervised. Id., at 51-68. Ledbetter herself testified about the discriminatory animus conveyed to her by plant officials. Toward the end of her career, for instance, the plant manager told Ledbetter that the “plant did not need women, that [women] didn’t help it, [and] caused problems.” Id., at 36.[10] After weighing all the evidence, the jury found for Ledbetter, concluding that the pay disparity was due to intentional discrimination.
Yet, under the Court’s decision, the discrimination Ledbetter proved is not redressable under Title VII. Each and every pay decision she did not immediately challenge wiped the slate clean. Consideration may not be given to the cumulative effect of a series of decisions that, together, set her pay well below that of every male area manager. Knowingly carrying past pay discrimination forward must be treated as lawful conduct. Ledbetter may not be compensated for the lower pay she was in fact receiving when she complained to the EEOC. Nor, were she still employed by Goodyear, could she gain, on the proof she presented at trial, injunctive relief requiring, prospectively, her receipt of the same compensation men receive for substantially similar work. The Court’s approbation of these consequences is totally at odds with the robust protection against workplace discrimination Congress intended Title VII to secure. See, e. g., Teamsters v. United States, 431 U. S., at 348 (“The primary purpose of Title VII was to assure equality of employment opportunities and to eliminate ... discriminatory prac *661 tices and devices ... (internal quotation marks omitted)); Albemarle Paper Co. v. Moody, 422 U. S. 405, 418 (1975) (“It is . . . the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination. ”).
This is not the first time the Court has ordered a cramped interpretation of Title VII, incompatible with the statute’s broad remedial purpose. See supra, at 652-654. See also Wards Cove Packing Co. v. Atonio, 490 U. S. 642 (1989) (superseded in part by the Civil Rights Act of 1991); Price Waterhouse v. Hopkins, 490 U. S. 228 (1989) (plurality opinion) (same); 1 B. Lindemann & R Grossman, Employment Discrimination Law 2 (3d ed. 1996) (“A spate of Court decisions in the late 1980s drew congressional fire and resulted in demands for legislative change[,]” culminating in the 1991 Civil Rights Act (footnote omitted)). Once again, the ball is in Congress’ court. As in 1991, the Legislature may act to correct this Court’s parsimonious reading of Title VII.
* * *
For the reasons stated, I would hold that Ledbetter’s claim is not time barred and would reverse the Eleventh Circuit’s judgment.

 If the complainant has first instituted proceedings with a state or local agency, the filing period is extended to 300 days or 30 days after the denial of relief by the agency. 42 U. S. C. §2000e-5(e)(l). Because the 180-day period applies to Ledbetter’s case, that figure will be used throughout. See ante, at 622, 624.

 National Railroad Passenger Corporation v. Morgan, 536 U. S. 101, 117 (2002), the Court emphasizes, required that “an act contributing to the claim oceu[r] within the [charge-]filing period.” Ante, at 638, and n. 7 (emphasis deleted; internal quotation marks omitted). Here, each paycheck within the filing period compounded the discrimination Ledbetter encountered, and thus contributed to the “actionable wrong,” i. e., the succession of acts composing the pattern of discriminatory pay, of which she complained.

 See also Bierman & Gely, “Love, Sex and Politics? Sure. Salary? No Way”: Workplace Social Norms and the Law, 25 Berkeley J. Emp. & Lab. L. 167, 168, 171 (2004) (one-third of private sector employers have adopted specific rules prohibiting employees from discussing their wages with co-workers; only one in ten employers has adopted a pay openness policy).

 The Court also relies on Machinists v. NLRB, 362 U. S. 411 (1960), which like Evans and Ricks, concerned a discrete act: the execution of a collective-bargaining agreement containing a union security clause. 362 U. S., at 412, 417. In Machinists, it was undisputed that under the National Labor Relations Act (NLRA), a union and an employer may not agree to a union security clause “if at the time of original execution the union does not represent a majority of the employees in the [bargaining] unit.” Id., at 412-414, 417. The complainants, however, failed to file a charge within the NLRA’s six-month charge-filing period; instead, they filed charges 10 and 12 months after the execution of the agreement, objecting to its subsequent enforcement. See id., at 412, 414. Thus, as in Evans and Ricks, but in contrast to Ledbetter’s case, the employment decision at issue was easily identifiable and occurred on a single day.

 No Senate Report was submitted with the Civil Rights Act of 1991, which was in all material respects identical to the proposed 1990 Act.

 The Court dismisses the EEOC’s considerable “experience and informed judgment,” Firefighters v. Cleveland, 478 U. S. 501, 518 (1986) (internal quotation marks omitted), as unworthy of any deference in this case, see ante, at 642-643, n. 1L But the EEOC’s interpretations mirror workplace realities and merit at least respectful attention. In any event, the level of deference due the EEOC here is an academic question, for the agency’s conclusion that Ledbetter’s claim is not time barred is the best reading of the statute even if the Court “were interpreting [Title VII] from scratch.” See Edelman v. Lynchburg College, 535 U. S. 106, 114 (2002); see supra, at 646-655 and this page.

 Further, as the EEOC appropriately recognized in its brief to the Eleventh Circuit, Ledbetter’s failure to challenge particular pay raises within the charge-filing period “significantly limitfe] the relief she can seek. By waiting to file a charge, Ledbetter lost her opportunity to seek relief for any discriminatory paychecks she received between 1979 and late 1997.” EEOC Brief 14. See also supra, at 654-656.

 Under the EPA, 29 U. S. C. § 206(d), which is subject to the Fair Labor Standards Act’s time prescriptions, a claim charging denial of equal pay accrues anew with each paycheck. 1 B. Lindemann & P. Grossman, Employment Discrimination Law 529 (3d ed. 1996); cf. 29 U. S. C. § 255(a) (prescribing a two-year statute of limitations for violations generally, but a three-year limitation period for willful violations).

 For example, under today’s decision, if a black supervisor initially received the same salary as his white colleagues, but annually received smaller raises, there would be no right to sue under Title VII outside the 180-day window following each annual salary change, however strong the cumulative evidence of discrimination might be. The Court would thus force plaintiffs, in many cases, to sue too soon to prevail, while cutting them off as time barred once the pay differential is large enough to enable them to mount a winnable case.

 Given this abundant evidence, the Court cannot tenably maintain that Ledbetter’s case “turned principally on the misconduct of a single Goodyear supervisor.” See ante, at 632, n. 4.